C. A. GAMBONI ET AL., APPELLEES, V. COUNTY OF OTOE IN THE STATE OF NEBRASKA ET AL., APPELLANTS.

67 N. W. 2d 489

Filed December 10, 1954. No. 33592.

418

Clarence S. Beck, Attorney General, Chauncey C. Sheldon, Otto H. Wellensiek, and Robert L. Morrissey, for appellants.

Betty Peterson Sharp, Moran & James, Tyler & Frerichs, T. Simpson Morton, and John L. Mattox, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

WENKE, J.

This is an appeal from the district court for Otoe County. The action was brought by five named plaintiffs, each the owner of real estate situated in one of the two cities located in Otoe County, Nebraska. It was brought by them on their own behalf and on behalf of all other real property owners in the cities and villages located in Otoe County who are similarly situated. The basis of their complaint is that the officials of Otoe County increased the assessed value of their properties in 1952 over what it was in 1951 without complying with the statutory and constitutional requirements authorizing them to do so. The purpose of the action is to enjoin, for the year 1952, the assessment of plaintiffs' real properties and the real properties of all other parties similarly situated to the extent the assessed values thereof were increased over the 1951 assessed valuations; to enjoin the levy of taxes on said properties to the extent that the same are based on such increases; and to enjoin the collection of taxes thereon to the extent such taxes are based upon such increases. Actions of this character are authorized by section 25-319, R. R. S. 1943.

The trial court enjoined the collection of any taxes on any real estate of the plaintiffs, or of other real property owners similarly situated, for the year 1952 that was

occasioned by any increase in the assessed valuation of their properties over what it had been for the preceding year except such increases as were occasioned by the assessment of new improvements not previously assessed. This was done on the basis that the increased assessments were void.

Previous to trial, and while the action was pending, the following order was entered on November 24, 1952: "* * * Henry E. Schemmel, County Treasurer of Otoe County, Nebraska, is hereby directed and commanded to separately audit the payments of taxes made by the plaintiffs and other persons similarly situated so as to reflect the amount of taxes occasioned by any increase in valuation subsequent to the year of 1951, and the said County Treasurer, defendant, is hereby further ordered and commanded to record all of said tax payments as being made under protest, and to separately deposit and hold any such increased amount in trust and to maintain a trust account thereof, not to be distributed, until the final order, judgment and decree entered herein."

The county treasurer kept the money held by him pursuant to this order in a separate fund. The court ordered the county treasurer to deduct from this fund any amounts paid and placed therein that resulted from increased assessments based on new improvements not previously assessed. From the balance of the fund the court ordered the county treasurer to pay plaintiffs' attorneys the sum of $7,500, which amount it allowed them for services herein. It then directed the balance of the fund to be distributed to the respective taxpayers from whom it was collected in proportion to their respective interests therein. Motion for new trial having been made and overruled, this appeal was taken by the defendants.

The general background out of which this litigation had its inception is as follows: In the forepart of 1951 the board of county commissioners of Otoe County, hereinafter referred to as the county board, established a

real estate classification and reappraisal committee. Authority for the county board to establish such a committee is provided by section 77-1301, R. R. S. 1943. On June 14, 1951, this committee reported to the county board that on May 1, 1951, it had received bids on the reappraisal work of the county and recommended the county board approve the bid it had received from the J. M. Cleminshaw Appraisal Company so the committee could enter into a contract with the bidder for the immediate appraisal of town properties. This bid contained an option giving the company the right to appraise the rural property in the following fiscal year for an amount therein stated. On the same day the county board rejected these recommendations and discontinued the committee. The committee members were not notified of this action, and of the fact that they had been relieved of further duty, until June 21, 1951. In the meantime, on June 16, 1951, they filed a report with the county board to the effect: "Your committee has examined the valuation placed on various real estate in the county for the purpose of taxation. Your committee has further viewed the real estate and the improvements thereon to determine whether or not these various tracts are valued on an equitable basis. We find from our examination great inequality and inequities in the valuation placed on the various tracts. In many instances property of equal value is assessed unequally and in other instances property which varies greatly in value is assessed as having the same value for tax purposes. Therefore, many taxpayers are paying more taxes than they should and others are not paying as much. In view of this fact we feel that the lands and town lots of the county should be reappraised."

Thereafter, on July 17, 1951, the county board took the following action: "* * * the recommendation of the Otoe County Reappraisal Committee employ the J. M. Cleminshaw Co., of Cleveland, Ohio to reappraise the lots and buildings in the towns and cities of Otoe County

be accepted. The County Clerk is instructed to contact the J M. Cleminshaw Co at once so that the work can be started on the reappraisal. Also it is the ententions (intention) of the County Board that a reappraisal of farm lands be undertaken in the future."

Pursuant to the foregoing the county board, on August 11, 1951, took the following action: "* * * that the J. M. Cleminshaw Co. be employed to make a reappraisal of all town and city property in Otoe County, Nebraska, for the sum of $15,500.00. This company was recommended by the Otoe County Reappraisal Board."

The contract entered into pursuant thereto provided: "The J. M. Cleminshaw Company, a Partnership, hereby proposes by way of assistance to the Assessor to make a complete revaluation of all taxable real property within the corporate limits of the City of Nebraska City and all cities and villages of Otoe County including Burr, Douglas, Dunbar, Lorton, Otoe, Palmyra, Syracuse, Talmage and Unadilla Nebraska according to the following specifications. This is to include business properties in County."

This contract set out in detail the manner in which the revaluation should be made. It would serve no useful purpose to herein set out these specifications. That the county board had authority to hire assistance to help the county assessor is established by our opinion in Speer v. Kratzenstein, on rehearing, 143 Neb. 310, 12 N. W. 2d 360. Therein we said: "* * * unless prohibited by statute, a county board may adopt such means as in its judgment shall be necessary in assisting county officers properly to discharge the duties of their offices."

The J. M. Cleminshaw Company, whom we shall hereinafter refer to as the company, thereupon appraised and revalued all the taxable real properties within the corporate limits of all the cities and villages of Otoe County and in addition thereto all business properties located in rural areas of the county. The number of such business properties located in rural areas was very lim-

ited. The classification of these properties was into two categories, that is, business and residential. The total number of properties appraised in all the cities and villages of the county totaled 3,861. The company placed all of the data which it used in arriving at values on filing cards. It also placed thereon the value it arrived at for both the real estate and the improvements. The cards were of two colors, one to indicate residential property and the other business property. These cards, when completed, were turned over to the county assessor and are still in his possession. The county assessor checked all of these cards for possible mathematical errors or other mistakes. He then studied the values placed thereon to see if any properties were out of line and, in all cases where he thought they might be, he checked the property personally. This checking resulted in some changes being made but generally the assessor used the figures given him by the company in arriving at the assessed value of these properties for 1952, at first using 47 percent thereof for that purpose. This resulted in the assessed value of 2,304 properties being raised and 1,557 being lowered. He thereupon notified the owners of the 2,304 properties of the fact that the assessed valuation of their property had been raised for 1952, using post cards for that purpose. Subsequently, about May 10, 1952, he lowered the 1952 assessed valuation of these 3,861 properties by using 43 percent of the company's figures. This was done after the post card notices had been sent out. The 43 percent is the assessed valuation which he finally submitted to the county board of equalization.

The county board of equalization, after making some adjustments, did, on June 25, 1952, accept the assessor's assessed valuations and taxes were subsequently assessed and levied on these accepted values. The increased taxes on these properties resulting from the increased values are the cause of this action.

The first question that arises is the right of appellees

to maintain this type of action, that is, injunction.

In Western Union Telegraph Co. v. Douglas County, 76 Neb. 666, 107 N. W. 985, we said: "A suit in equity will not lie when the plaintiff has a plain, adequate and speedy remedy at law."

However, in Hemple v. City of Hastings, 79 Neb. 723, 113 N. W. 187, we said: "* * * where a tax is void, i.e., where there is no tax which the plaintiff is in equity bound to pay, he may invoke the aid of a court of equity to protect his rights by injunction, notwithstanding such provision."

As stated in Peterson v. Hancock, 155 Neb. 801, 54 N. W. 2d 85: "It is elementary, of course, that when taxes are levied on property without authority of law a court of equity may enjoin collection thereof."

And in Brown v. Douglas County, 98 Neb. 299, 152 N. W. 545, we held: "So much of the taxes as are levied upon the valuation above that fixed by the county assessor is void, and its collection may be enjoined." See, also, Philadelphia Mortgage & Trust Co. v. City of Omaha, 65 Neb. 93, 90 N. W. 1005; Crane Co. v. Douglas County, 112 Neb. 365, 199 N. W. 791.

Insofar as the restraining order entered November 24, 1952, is concerned sections 77-1728 to 77-1736, R. R. S. 1943, would ordinarily provide a remedy at law for the refund of taxes if the individual taxpayers are entitled to a return thereof. See, Bellevue Improvement Co. v. Village of Bellevue, 39 Neb. 876, 58 N. W. 446.

However, we said in Best & Co., Inc. v. City of Omaha, 149 Neb. 868, 33 N. W. 2d 150, by quoting from Golden v. Bartholomew, 140 Neb. 65, 299 N. W. 356: " ' "An adequate remedy at law means a remedy which is plain and complete and as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." Standard Oil Co. v. O'Hare, 122 Neb. 89, 239 N. W. 467.' "

We think the following language from 51 Am. Jur., Taxation, § 1227, p. 1047, has particular application to

this restraining order: "The necessity of resorting to a multiciplicity of actions for redress against an unlawful tax negatives the existence of an adequate remedy at law and sustains the remedy by injunction." See, also, Pomeroy's Equity Jurisprudence (5th ed.), § 260, p. 526; Pierce v. Green, 229 Iowa 22, 294 N. W. 237, 131 A. L. R. 335.

As to the 2,304 properties that the assessor raised in value, section 77-1315, R. R. S. 1943, provides in part: "In years in which real estate is assessed for taxation purposes, it shall be the duty of the county assessor, to notify the record owner of every piece of real estate which has been valued at a higher figure than at the last previous assessment. Such notice may be given by post card, addressed to said owner's last-known address. It shall describe said real estate, and state the old and new valuation thereof and the date of the convening of the board of equalization."

In compliance therewith the assessor sent a post card to all the owners whose real estate had been valued higher for 1952 than it had been in 1951. Each post card contained a description of the owner's property, the old (1951) valuation, and the new (1952) valuation, but did not set out the date on which the county board of equalization would convene. The latter is fixed by statute and was then the first Monday in May or May 5, 1952. See § 77-1502, R. R. S. 1943.

We said in Power v. Jones, 126 Neb. 529, 253 N. W. 867: "If a tax or assessment is levied without authority of law, it is, of course, void. This sometimes arises when the levy is made without a compliance with the jurisdictional requirements."

We held in Rosenbery v. Douglas County, 123 Neb. 803, 244 N. W. 398: "The provision of section 77-1612, Comp. St. 1929 (now section 77-1315, R. R. S. 1943), requiring notice to the landowner of any increase in assessed value of his realty over the last previous assessment is mandatory. A tax levied on such increase, made

without notice to the owner, is void, and its collection may be enjoined."

We have held the same in regard to the notice that is required by section 77-1504, R. R. S. 1943, to be given an owner by the board of equalization of any raise it intends to make of the owner's property. See, Brown v. Douglas County, *supra;* Crane Co. v. Douglas County, *supra.* As said in Crane Co. v. Douglas County, *supra:* "A county board of equalization is without jurisdiction to raise the assessment of any person until it has first complied with the provisions of section 5972, Comp. St. 1922 (now section 77-1504, R. R. S. 1943), which are pertinent to such proceedings."

What has been said of the notice itself being mandatory we think is equally applicable to what the Legislature has said shall be contained therein. What was said in Rosenbery v. Douglas County, *supra,* has application here. Therein we said: "The legislature no doubt intended that the owner of realty might rely upon the last previous assessed valuation of his real estate as being that at which it would be returned again, unless he received notice of increase and was afforded an opportunity to appear before the board of equalization and contest such increase in value, if he felt that the increase was unwarranted."

We find the failure to set out in the notices the date when the board of equalization would convene was such a defect as to make the notices given without force and effect and left the assessor without authority to make the raises. In view thereof all raises based on these notices, except as hereinafter set forth, are void and any tax levied thereon is likewise void and the collection thereof may be enjoined.

The record establishes that most, but not all, of the real property owners whose property was raised in value also filed personal tax schedules for 1952 and in doing so were either given an original and a copy or just a copy thereof. These personal tax schedules, the rec-

ord shows, were filed a month or more before May 5, 1952. On the back of these schedules appears the following language: "The County Board of Equalization, which is composed of the County Board, the County Assessor, and the County Clerk, meets on the first Monday in May and continues in session not more than fifty days, or less than three days." We do not think, because most of these property owners received the information in this manner, that it fulfills the requirements of the statute. The statute contemplates the information required to be given shall all be contained in the notice given. Subject to the same reasoning is the following notice published by the county board of equalization in the Nebraska City News-Press dated May 27, 1952:

"The last day for filing protests on real estate valuations for 1952 is noon on May 31, 1952.

"A written protest must be filed, either on a blank which may be secured at the County Assessor's office, or in a letter to the Board of Equalization. Reasons for the protest must be given."

We find the statute requires the notice must be given by the assessor and that it must specifically contain all the information the statute requires shall be set forth therein.

There are a small number of property owners whose assessed valuations were increased because of new improvements that had not been assessed prior to 1952. It was the duty of the assessor to add these to the tax rolls. See § 77-1306, R. R. S. 1943. This statute provides in part: "Each county assessor * * * shall annually * * * take a list of * * * all buildings and all other improvements of any kind, if over one hundred dollars in value, which shall not have been previously included in the value of the land and lots on which such improvements have been made. In the return he shall give a description of the tract of land or lot upon which the improvements have been made, the kind of improvements so

made, and the true value added to such parcel of land or lots by such improvements."

We said in Watson Bros. Realty Co. v. County of Douglas, 149 Neb. 799, 32 N. W. 2d 763: "The notice to an owner of property, provided for in section 77-1315, R. S. 1943, is not required in cases where real estate is assessed under the provisions of section 77-1306, R. S. 1943."

The record also shows that of the 2,304 tracts of real property in the cities and villages of Otoe County, the assessed value of which property the assessor raised in 1952 over what it had been in 1951, some 501 written protests were filed in regard thereto with the county board of equalization. By doing so such protestants waived the jurisdictional defect in the notice. Nor would the fact that some withdrew their protests affect this waiver.

As stated in Bankers Life Ins. Co. v. County Board of Equalization, 89 Neb. 469, 131 N. W. 1034: "We are therefore of opinion that the act of the assessor in adding the amount of the capital stock and surplus of the insurance company to its schedule, as returned by the proper officer, was void; and, if the company had filed no complaint and made no appearance before the board of equalization, it could have successfully resisted the payment of any tax levied upon the increased valuation of which it complains."

We held therein: "It appears, however, that the company in some way became aware of the change in its schedule, filed its complaint before the county board of equalization, and thereby gave the board jurisdiction to determine the matters complained of." See, also, Minneapolis Dredging Co. v. Reikat, 141 Neb. 475, 3 N. W. 2d 887.

There are two additional questions presented in relation to the increased assessments but in view of what we have hereinbefore said they relate only to the prop-

erty owners who filed written protests with the board of equalization.

The first of these questions relates to the assessor's duties in regard to assessing these properties for 1952 and the performance thereof. The statute then in force provided: "All property in this state, not expressly exempt therefrom, shall be subject to taxation, and shall be valued and assessed at its actual value." § 77-201, R. R. S. 1943.

Actual value means its value in the market in the ordinary course of trade. See, Chicago, R. I. & P. Ry. Co. v. State, 111 Neb. 362, 197 N. W. 114; Schulz v. Dixon County, 134 Neb. 549, 279 N. W. 179, 119 A. L. R. 1294; Laflin v. State Board of Equalization & Assessment, 156 Neb. 427, 56 N. W. 2d 469.

As already stated, the company was employed to assist the assessor in making a revaluation of all taxable real property in the cities and villages of the county, including such business properties as were located in rural areas.

The company valued the lots in Nebraska City primarily by their distance and direction from a selected point, that is, Eighth Street and Central Avenue. This point was considered the most valuable in the city. How they were determined in Syracuse and the eight villages is not clearly shown although apparently by location.

The value of the improvements on these lots was determined primarily by considering the size and type of construction of each improvement and applying thereto the 1941 cost of construction per square foot, which cost of construction was based on the company's price list book, and then depreciating that figure in accordance with the age and present condition of the improvement. Included in the data used for determining construction costs were many factors such as heating, plumbing, lighting, insulation, tiling on floors, use, occupancy, rentals, and many others. These are fully set out on the cards that the company used and on which,

after it had determined the value of both the real estate and improvements, it placed such values and then delivered them to the assessor.

As has already been stated herein, when the company delivered these cards to the assessor he first checked all of them for possible mathematical errors or other mistakes. He then studied the company's values placed on each property to see if he thought the values placed on any of them were out of line as to the actual value thereof and, in all cases where he thought they might be, he checked the property personally. As a result of this checking and as a result of complaints he received from individual property owners, the assessor made some changes in values but generally speaking the figures given him by the company were used in arriving at the assessed values he used for 1952. He ultimately arrived at the assessed values for 1952 by taking 43 percent of the figures given him by the company except in the few instances where he had made changes.

The company, under its contract, did not and could not have put a binding value on any of the properties. It merely furnished to the assessor the values it arrived at and the evidence of how it arrived at those figures. The assessor, whose duty it was to assess these properties at their actual value, did not delegate this duty to the company which the county board had hired to assist him. It is true that he generally accepted its valuations and used a percent thereof for the assessed values he used but this did not have the effect of delegating his authority to the company as he could change any and all values it had placed thereon. After the assessor placed his value thereon it was still a question of fact whether or not the assessed values he placed thereon were the actual values of the individual properties. The latter was a question for the board of equalization to determine. § 77-1504, R. R. S. 1943.

Section 77-1853, R. R. S. 1943, provides: "Irregularities in making * * * shall not * * * in any manner in-

validate the tax levied on any property or charged against any person."

Ordinarily, "The valuation of property made by the proper assessing officer is presumed to be correct, * * *." Brown v. Douglas County, *supra*.

And in State ex rel. Bee Building Co. v. Savage, 65 Neb. 714, 91 N. W. 716, we said: "The presumption is that, when an officer or assessing body values property for assessment purposes, he acts fairly and impartially in fixing such valuation."

We think the effect of what the assessor here did is properly decided in the following two cases from Iowa: Clark v. Lucas Co. Board of Review, 242 Iowa 80, 44 N. W. 2d 748; Haubrich v. Johnson, 242 Iowa 1236, 50 N. W. 2d 19.

In Clark v. Lucas Co. Board of Review, *supra*, the court said:

"Although the evidence shows that the assessor did not follow the Wilkins valuation blindly, but made independent investigation of his own and weighed all of the various factors required by statute, section 441.4, Code of 1946 (441.13, Code of 1950) in making his valuations, we are persuaded to the conclusion that he gave much weight to the Wilkins appraisals. For that reason we have disregarded the usual presumption in favor of the assessor's valuations in passing upon this appeal.

"Even though the complaining taxpayer be relieved from the burden of overcoming the presumption that the assessor's valuation is correct, he nevertheless has the statutory burden of proof in establishing his contention that the valuation is excessive, inadequate, or inequitable."

And in Haubrich v. Johnson, *supra*, the court said: "* * * where the assessor did not make a personal inspection of the properties, either by himself or a deputy, but accepted the valuations fixed by a professional appraiser, the presumption in favor of the assessment does not obtain. * * * But the burden was still upon the

plaintiffs to prove that the assessments were excessive."

If what the assessor did resulted in any one or all of the properties of those who protested being assessed too high such owners should have introduced evidence before the board of equalization to that effect in support of their protests and then, if no relief was obtained, they should have appealed therefrom to the district court. See section 77-1510, R. R. S. 1943, which provides for such appeal.

As said in Power v. Jones, *supra:* "I have been unable to find a decision in Nebraska holding that if an assessment was too high the tax would be absolutely void. In cases where property is assessed at a higher proportion of its actual value than other property similarly located, the taxpayer should first apply to the board of equalization to correct any errors therein. This appears to be a prerequisite to bringing legal action."

As further stated in Power v. Jones, *supra:*

"Where the claim is made that real property is assessed too high, the taxpayer should first apply for relief to the board of equalization, as provided in section 77-1702, Comp. St. 1929, and if relief is there denied, he should appeal to the courts.

"The claim that real property is assessed too high cannot be made for the first time in a collateral attack against the collection of the tax."

As stated in Bellevue Improvement Co. v. Village of Bellevue, *supra:* "It does, however, appear, without substantial contradiction, that the assessors for the different precincts of the county at their meeting determined arbitrarily that such lots should be uniformly assessed at $10 each, and that the assessment was so made in the case of the plaintiffs' lots because of such resolution and without any exercise of judgment upon the part of the assessor or his deputy, without a view of the property, and wholly regardless of the actual value of the different lots. It also appears that the valuation placed upon these lots was greatly in excess of the

assessed valuation upon much other property in the vicinity apparently of as great actual value. But this feature is not important, because the remedy for a disproportionate valuation would be before the board of equalization."

We find, for the reasons stated, that the usual presumption that the valuations placed on these properties by the assessor were correct does not obtain but we do not think, because thereof, that they are void. The burden is still on the property owner protesting to a board of equalization to prove that the assessment made of his property is in excess of the actual value in order to obtain any relief. If relief is there denied there is an adequate remedy at law provided by statute which permits an appeal therefrom to the district court. The claim that real property is assessed too high cannot be made for the first time in a collateral attack against the collection of the tax.

A further question is presented to the effect that the assessments, as made, resulted in a lack of uniformity between the properties raised by the revaluation and other properties in the county and thus the assessment is in conflict with the constitutional requirement as to uniformity. In this respect our Constitution provides: "* * * taxes shall be levied by valuation uniformly and proportionately upon all tangible property * * *." Art. VIII, § 1, Constitution of Nebraska. The rule of uniformity applies to both the rate of taxation and valuation of property for tax raising purposes. See State ex rel. Morton v. Back, 72 Neb. 402, 100 N. W. 952, 69 L. R. A. 447.

Appellees contend that inequalities and want of uniformity in the assessment of real properties existed throughout the county, that is, in the cities, villages, and rural areas. They say this is evidenced by the report of the county real estate classification and reappraisal committee and by the action of the county board in relation to its having the J. M. Cleminshaw Company

revalue all taxable real estate in the county, including that in the rural areas as well as in the cities and villages. A contract to revalue the rural properties was entered into with the company on September 5, 1952. The appellees further contend the fact that all taxable real properties in the rural areas were not revalued for assessment purposes in 1952, while those in the cities and villages were, and the fact that of the ten school districts in the county, each of which contains one of the cities or villages therein and all of which school districts are larger in area than the corporate limits of the village or city contained therein, no revaluation was had of the rural properties located therein, and the fact that in the two cities the revaluation resulted in a total increase of the assessed valuation of the real property while in the eight villages it resulted in a decrease, is evidence that a lack of uniformity in the assessment of real property in the county exists and a consequent disproportionate levy of taxes on parts thereof results therefrom. This situation, if it actually brought about the condition complained of, the board of equalization apparently made no effort to correct.

"The presumption obtains that a board of equalization has faithfully performed its official duties, and that in making an assessment it acted upon sufficient competent evidence to justify its action." Watson Industries v. County of Dodge, ante p. 311, 66 N. W. 2d 589.

The record shows no action by the board of equalization to equalize valuations as between real properties in the cities and villages and that in rural areas after the revaluation of the former. Nor was any action taken by it in this regard between rural areas in school districts containing a city or village and the real property in such city or village. Whether or not the increase in the total value of all real properties in the two cities and lowering thereof in the eight villages by reason of the revaluation resulted in any lack of uniformity of the assessments of the properties in the county or in a disproportionate bur-

den of taxes thereon it is not necessary for us to decide.

We said in State ex rel. Morton v. Back, *supra:* "In all schemes of taxation there are generally recognized elements of inequality and the probability of erroneous valuations in the assessment of property by whatever mode the assessment may be made. The evil is usually remedied by the exercise of the authority of a board created for that purpose, whereby the assessment of different properties is brought to a common standard of value."

We then went on to say therein: "The inequalities in values thus returned, if any there be, is a proper subject for consideration by a body or tribunal authorized to discharge the functions of a board of equalization."

Such authority was lodged in the county board of equalization both as to individuals and taxing district. See §§ 77-1504 and 77-1505, R. R. S. 1943.

We went on in State ex rel. Morton v. Back, *supra,* to say that: " 'Whatever directions the law may give to the assessor in valuing the property in the first instance, and whatever result these directions may produce in the assessment of franchises or other property of the taxpayer, the work of the board of equalization is to equalize the valuations made, so that every one, as nearly as that may be attained, shall stand upon an equal footing, and pay an equal proportion of the tax laid, according to the real value of his property. * * * In this way, equality is attained and every interest protected.' (State v. Fleming, 70 Neb. 523, 97 N. W. 1063.) * * * 'And this rule of uniformity applies not only to the rate of taxation but as well to the valuation of property for the purpose of raising revenue. The constitution forbids any discrimination whatever among taxpayers, thus, if the property of one citizen is valued for taxation at one-fourth its value, others within the taxing district have the right to demand that their property be assessed on the same basis.' (State v. Osborn, 60 Neb. 415, 83 N. W. 357.)"

As stated in Western Union Telegraph Co. v. Douglas County, *supra:* "The statute affords a plain adequate and speedy remedy to one whose property has been excessively valued for taxation and in cases in which the county board of equalization has committed prejudicial errors or irregularities in procedure."

As to the property owners who filed protests they were obligated to raise any question covering unequal assessment between individuals or taxing districts before the county board of equalization, who had authority to deal therewith. If no relief on this basis could be obtained they then could have appealed therefrom to the district court. The law gave them a full and adequate remedy and this type of action is therefore not available to them.

Assessments on property are not void merely because some properties are assessed higher than others. That fact, when properly presented and established, is basis for adjustment by the tribunal having authority for that purpose.

Appellants contend this is not a case in which the allowance of an attorney's fee is authorized. We have often held, as most recently stated in State ex rel. Ebke v. Board of Educational Lands & Funds, *ante* p. 79, 65 N: W. 2d 392: "It is the practice in this state to allow the recovery of attorney's fees and expenses only in such cases as are provided for by statute, or where the uniform course of procedure has been to allow such recovery." See, also, Blacker v. Kitchen Bros. Hotel Co., 133 Neb. 66, 273 N. W. 836.

We have uniformly allowed the recovery of attorney's fees in actions to which the following has application: "* * * where the services of a litigant's attorney result in rescuing or preserving a large amount of property or funds, not only for the benefit of the particular litigant, but for the benefit of all others in the same class, and by means of these services the property or funds are conserved for the benefit of all, nothing is plainer than

that the cost should be borne by those benefited by it."
Blacker v. Kitchen Bros. Hotel Co., *supra.*

The court therein went on to quote the following
from Buell v. Kanawha Lumber Corp., 201 F. 762:
" 'The general equitable principle on which American
courts act in allowing counsel fees from a fund in court
for distribution is that where one has gone into a court
of equity, and, taking the risk of litigation on himself,
has created or preserved or protected a fund in which
others are entitled to share, such others will be required
to contribute their share to the reasonable costs and
expenses of the litigation, including reasonable fees to
complainant's counsel; but, to warrant such allowance,
the fund so created or preserved must be one applicable
to the claims of the complainant and those interested
with him, * * *.' "   See, also, Allen v. City of Omaha,
136 Neb. 620, 286 N. W. 916.

This rule is based on the theory that all in a class
benefited should contribute to the expense, their share
thus being necessarily entirely dependent upon the suc-
cess of the litigation.  We think this applies to all those
who contributed to the fund now held by the treasurer
and who, under the holdings herein, are entitled to have
their proportionate share of that fund returned.  We
think, however, that the sum of $7,500 allowed by the
trial court to be sufficient for services rendered both in
that court and this.

In view of the foregoing we hold that all the owners
of real property in the two cities and eight villages of
Otoe County, together with the owners of business
properties located in rural areas, the assessed valuation
of whose property for 1952 was increased over what it
was for 1951, are entitled to the relief they prayed for
except in cases where the increase resulted from new
improvements which had not previously been assessed
or where such owners filed a written protest with the
county board of equalization in regard thereto.  This
requires enjoining the collection of any tax based on

such increase with directions that the proper county officers remove it from their records. However, in cases where it has been paid, and is being held by the county treasurer pursuant to order of the district court, it should be refunded to each taxpayer entitled thereto but only in proportion to his share after the attorney's fee herein approved has been deducted therefrom as directed.

As to the fund held by the county treasurer he should first deduct therefrom any sum held because of any increase in taxes resulting from new improvements not assessed prior to 1951 and for any taxes paid by property owners who filed written protest with the board of equalization in regard to the 1952 assessment of their real property. The funds so deducted should be distributed as all other taxes. Out of the balance he should first pay the attorneys the fee they have been allowed and the remainder should then be distributed proportionately to those who it has been herein determined are entitled to the refund thereof. We reverse the action of the trial court with directions to enter a decree in accordance herewith. All costs are taxed to the county.

REVERSED AND REMANDED WITH DIRECTIONS.