In re Appeal from the Assessed Valuation of Real Estate Approved by the Board of Equalization for County of Logan, Nebraska. John N. Collier et al., Appellants, v. County of Logan, Nebraska, et al., Appellees.

97 N. W. 2d 879

Filed July 17, 1959. No. 34588.

*Crosby, Pansing & Guenzel* and *Crosby & Nielsen*, for appellants.

*Robert E. Roeder* and *Edward E. Carr*, for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiffs, John N. Collier and his wife, Helen L. Collier, filed a protest with the board of equalization of Logan County, contending that their ranch lands were valued too high for tax purposes in 1957, and that such valuation was discriminatory as lacking in equality and uniformity with other real property in the county. After a public hearing thereof, along with 17 other comparable protests filed by other ranchers, the board of equalization rendered an order rejecting said protests. Therefrom plaintiffs and the other protestants appealed to the district court for Logan County, as provided by sections 77-1510 and 77-1511, R. R. S. 1943. Thereafter, plaintiffs filed their petition on appeal and defendants, County of Logan, its board of county commissioners, board of equalization, and county assessor, filed an answer traversing the allegations of plaintiffs' petition, and plaintiffs were given leave to enter a general denial as reply thereto.

After trial on the merits by the court, whereat voluminous evidence was adduced, the trial court rendered judgment, which found generally in favor of defendants and against plaintiffs. It found that plaintiffs' lands were not assessed too high; that their assessments were comparable to the assessments of other property within the county; and that plaintiffs were not discriminated against by the county assessor or board of equalization. The judgment then dismissed plaintiffs' petition and appeal, and taxed costs to plaintiffs. Thereafter plaintiffs' motion for new trial was overruled and they appealed to this court, assigning in substance as far as important here that the judgment of the trial court was not sustained by the evidence but was contrary thereto and contrary to law. We do not sustain the assignments. In that connection, plaintiffs also assigned that the trial court erred in the admission of evidence, but that contention is disposed of by the holding in Pierce v. Fon-

tenelle, 156 Neb. 235, 55 N. W. 2d 658, and same requires no further attention.

No new question of law is presented for decision. There are certain pertinent statutes and authorities which are applicable and controlling. In that respect, section 77-201, R. S. Supp., 1955, effective September 18, 1955, provided that all tangible and real property in this state, not expressly exempt therefrom, should be valued at its basic value and assessed at 50 percent of such basic value, which should be taken and considered as the taxable value upon which the levy should be made. Also, section 77-112, R. S. Supp., 1955, effective upon like date, provided that basic value should mean the value of property for taxation that is ascertained by using the following formula where applicable: "(1) Earning capacity of the property; (2) relative location; (3) desirability and functional use; (4) reproduction cost less depreciation; and (5) comparison with other property of known or recognized value." We point out that such sections were amended in 1957 and now appear as sections 77-201 and 77-112, R. R. S. 1943, but they did not become effective until September 20, 1957.

As recently as Matzke v. Board of Equalization, 167 Neb. 875, 95 N. W. 2d 61, we held that: "An appeal to the district court from action of the county board of equalization is heard as in equity, and upon appeal therefrom to this court it is tried de novo.

"To secure a reduction in the assessed valuation of tangible property it must be demonstrated by evidence that the assessment is grossly excessive, or that its value has not been fairly and proportionately equalized, and is the result of arbitrary or unlawful action."

Also, as held in Ahern v. Board of Equalization, 160 Neb. 709, 71 N. W. 2d 307: "Ordinarily the valuation by the assessor is presumed to be correct, however if the assessor does not make a personal inspection of the property, but accepts valuations thereof fixed by a professional appraiser, the presumption does not obtain,

and in such case the burden is upon the protesting party to prove that the assessment is excessive.

"The presumption obtains that a board of equalization has faithfully performed its official duties, and in making an assessment it acted upon sufficient competent evidence to justify its action.

"The presumption that a board of equalization in making an assessment acted upon sufficient competent evidence to justify its action disappears when there is competent evidence on appeal to the contrary, and from that point on the reasonableness of the valuation fixed by the board becomes one of fact based upon evidence, unaided by presumption, with the burden of showing such value to be unreasonable resting upon the party complaining." See, also, Adams v. Board of Equalization, 168 Neb. 286, 95 N. W. 2d 627.

Further, as held in Gamboni v. County of Otoe, 159 Neb. 417, 67 N. W. 2d 489: "Unless prohibited by statute, a county board may adopt such means to assist county officers to properly discharge the duties of their offices as in its judgment it shall deem necessary."

In Newman v. County of Dawson, 167 Neb. 666, 94 N. W. 2d 47, we held: "Under the provisions of section 77-112, R. S. Supp., 1955, the elements required to be considered in fixing the assessed value of tangible property are the earning capacity of the property, its relative location, its desirability and functional use, its reproduction cost less depreciation, and by comparison with other properties of known or recognized value.

"The burden of proof is upon a taxpayer to establish his contention that the value of his property has been arbitrarily or unlawfully fixed by the county board of equalization in an amount greater than its actual value, or that its value has not been fairly and proportionately equalized with all other property resulting in a discriminatory, unjust, and unfair assessment.

"Where the evidence shows that the assessed value of tangible property has been determined by a formula in

substantial compliance with section 77-112, R. S. Supp., 1955, which has been uniformly and impartially applied, such assessed value will not ordinarily be disturbed on appeal on evidence indicating a mere difference of opinion as to such valuation.

"To secure a reduction in the assessed value of tangible property it must be demonstrated by evidence that the assessment is grossly excessive or that its value has not been fairly and proportionately equalized, and is a result of arbitrary or unlawful action. The evidence must be such as to indicate the exercise of arbitrary action or the failure of plain legal duty, and not a mere error in judgment."

In LeDioyt v. County of Keith, 161 Neb. 615, 74 N. W. 2d 455, we held that: "Individual discrepancies and inequalities in the valuation of real property for tax purposes must be corrected and equalized by the county board of equalization. The duties of the State Board of Equalization and Assessment are unrelated thereto and have no direct relationship to the duties of the county board of equalization. However, the final orders of each must be given effect.

"A real estate classification and reappraisal committee appointed under the provisions of section 77-1301, R. R. S. 1943, does not put a binding value upon any property. It merely makes recommendations to the county assessor and furnishes evidence for the use of the county board of equalization. Its duties in no manner disturb the requirements as to uniformity of taxation. (The same rule applies to professional appraisers duly employed by the reappraisal committee with approval of the county board.)

"Approximation both as to value and uniformity is all that can be accomplished, because absolute mathematical equality in the valuation of properties for tax purposes is unattainable. Therefore, substantial compliance with the requirements of equalization and uniformity in taxation laid down by the federal and state

constitutions is all that is required, and such provisions are satisfied when designed and manifest departures from the rule are avoided.

"The sale price of property may be taken into consideration in determining the actual value thereof for tax purposes, together with all other elements pertaining to such issue. However, sale price standing alone is not conclusive of the actual value of property for tax purposes and other matters relevant to the actual value thereof must be considered in connection with the sale price to determine actual value. The true test in all cases is to arrive at actual value, meaning value in the market in the ordinary course of trade.

"The burden of proof is upon the taxpayer to establish his contention that the value of his property has been arbitrarily or unlawfully fixed by the county board of equalization at an amount greater than its actual value, or that its value has not been fairly and properly equalized when considered in connection with the assessment of all other property, so that this disparity and lack of uniformity result in a discriminatory, unjust, and unfair assessment.

"Generally, the valuation of property for tax purposes by the proper assessing officers should not be overthrown by the testimony of one or more interested witnesses that the values fixed by such officers were excessive or discriminatory when compared with values placed thereon by such witnesses. Otherwise, no assessment could ever be sustained.

"Courts should not usurp the functions of tribunals created by law for ascertaining the actual value of property for tax purposes or constitute themselves a taxing board or board of equalization." See, also, Lucas v. Board of Equalization, 165 Neb. 315, 85 N. W. 2d 638.

In the light of such rules, we have examined the record. Because some 17 other comparable cases are still pending in the district court for Logan County, we have cited numerous applicable authorities and we will sum-

marize the evidence at length. In doing so, we will designate John N. Collier as plaintiff, and when speaking of both plaintiffs we will designate them as such. Also, the defendants will generally be designated as such when speaking of them collectively, but the board of county commissioners will generally be called the county board; the board of equalization will be designated as such; and the county reappraisal committee will be called the committee.

The record discloses the following relevant and material evidence: R. K. Haskell, who has been county clerk and ex officio county assessor, register of deeds, and clerk of the district court for Logan County, and has served as secretary of the county board of equalization since 1946, during a period of 12 years, was called as a witness by plaintiffs. As such, he kept and maintained the records required of him. Until 1955, he did all the appraisal work for the county. In the spring of 1955, the county board deemed it advisable to have a reappraisal of the entire county, so the board, as authorized by section 77-1301, R. S. Supp., 1955, duly appointed a reappraisal committee of three men who were residents of Logan County. It is well here to point out that one member of such committee was an implement dealer in Stapleton who was interested in the reappraisal of town property and land in the south part of the county which was adjacent to Lincoln County; another member was a rancher; and the other member was a rancher and farmer. That committee then contacted a representative of Wilkens and Associates, who were professional appraisers, hereinafter called Wilkens. Following a conference with such representatives by the county board and committee, a contract was entered into with Wilkens and approved by the county board on April 4, 1955, by which Wilkens agreed, for a stated consideration, to appraise all improvements and real property in the county. A copy of that contract appears in the record attached to a deposition of a representative of Wil-

kens. The provisions and specifications of that contract require no repetition here.

, In June 1955, an appraiser employed by Wilkens, who had a part-time assistant appraiser and clerical help, began the reappraisal work, in cooperation with and approval of the committee. It should be pointed out here that an office in the courthouse was provided for that purpose by the county board. In that connection, the county assessor testified that the reappraisal work began by using the regular county map; a county topographical map; a geodetic survey map of the county; photographs of the kind used by the agricultural stabilization and conservation offices; and a code valuation manual containing a list of tentative land values for the different types of land found in Logan County, which figures were arrived at and agreed upon by Wilkens and the committee, based upon their judgment of values and general sales of such types of land. The appraiser identified the land, the type and amount thereof, its owner, and code classifications showing actual value in 40-acre tracts on card forms prepared and used by Wilkens for that purpose. A sample of such cards and also those used in connection with the appraisal of plaintiffs' lands appear in the record. When the reappraisal had been completed, such cards were turned over to the assessor who filed them and set up his real estate book by taking basic value at 70 percent of actual value then taking 50 percent thereof as the assessed value upon which the levy was made in 1956. In 1957 the assessor's books were extended again in the same manner, except that basic value was called actual value and 35 percent thereof, or one-half of 70 percent of actual value, was figured as the assessed value on which the levy was made.

In that connection, Wilkens and the committee fixed the appraisals of the actual value of lands at "80 percent of what it would sell for" so that such appraisals would carry over and be of use for more than one year. Al-

though no jurisdictional element is shown to be lacking, plaintiffs argued that such an appraisal was unlawful and void. In other words, plaintiffs complain that actual value was originally fixed at 80 percent of market value, and that basic value for 1956 was fixed at 70 percent of that value, which was carried over into 1957 as actual value, but plaintiffs' assessed value on which the levy was made was only 35 percent, or one-half of such 70 percent. We conclude that such procedure was irregular but not void, and that same was entirely favorable and beneficial to plaintiffs who are in no position to complain of such procedure. Section 77-1853, R. R. S. 1943, specifically provides in part that: "Irregularities in making or equalizing assessments, or in making the returns thereof, shall not * * * in any manner invalidate the tax levied on any property or charged against any person." We quoted and applied such section in Gamboni v. County of Otoe, *supra*. Also, as said in State ex rel. Bee Building Co. v. Savage, 65 Neb. 714, 91 N. W. 716: "The object of the law of uniformity is accomplished if all property within the taxing jurisdiction is assessed at a uniform standard of value, as compared with its actual market value, even though there be great disparity between values as assessed for taxes and the value as fixed in the open markets by barter, exchange, or by buying and selling, and other commercial transactions in which values and prices enter as important factors." Plaintiffs' contention has no merit.

The county assessor, as a witness for plaintiffs, also testified that when the county board of equalization met in May 1957, his real estate books had been extended by him, and that thereafter he made up his tax books and imposed the tax based on the county levy times the assessed value, which were then submitted to the county treasurer for collection of taxes when due. He also testified that he had known plaintiffs' land and its topography for more than 40 years; that he had been on it a good many times; and that he knew the nature of its

soils and the kinds of crops grown thereon. He testified that before he had extended the reappraisals on his books, he personally and in his official capacity as assessor, went all over the lands in the county; that he checked the values as he saw and knew them with the values placed on them by Wilkens and the committee; that he made some changes in the reappraisal cards; and that he used the Wilkens' appraisal as an aid in fixing the values on the lands, but that he made an independent examination and adopted the Wilkens' appraisals only when he thought that they should not be changed. He testified that he went over and appraised the lands in the county, including plaintiffs, and that by and large he accepted the values of the lands as made by Wilkens, but that he did so only after he had gone over the lands and approved such values. In the light of such evidence and that hereinafter set forth, it cannot be said, as contended by plaintiffs, that the assessor did not make a personal inspection of plaintiffs' property but relied upon and accepted values thereof fixed by a professional appraiser and the committee.

The lands owned by plaintiffs are described in their petition on appeal. The voluminous description thereof need not be repeated here. It is sufficient to say, as testified by plaintiff, that they are divided into two separate tracts which are operated as a unit, supplementing each other, but are generally designated as the east and west ranches. The west ranch contains 2,320 acres as deeded, but U. S. Highway No. 83 which crosses it takes out about 20 acres, leaving roughly 2,300 acres of range or pasture land, used for summer grazing of plaintiffs' cattle. That land is fairly level in small areas to large hills, but is generally rolling with quite a portion of level land in patches which have been cultivated and let "grow back" to grass. There is a substantial grove of trees but no improvements on the west ranch. Its soil is sandy with a trace of humus in places, and it grows the usual types of grasses found through-

out such area. However, it has no so-called hay land. Plaintiffs purchased the west ranch in May 1948, for $12.50 an acre, and plaintiff gave as an opinion that lands generally around there were selling for more than they were worth and that their west ranch was worth about $12.50 to $14 an acre in 1957. In recent years plaintiffs usually had about 300 head of cattle on the ranch, and last year they got about 115 stacks of hay from their east ranch where their cattle were wintered. That east ranch contains 2,560 acres. In was purchased by plaintiffs in 1950 for a trifle over $19 an acre and was admittedly worth more than $19 an acre in 1957. It has some semi-wet hay land on it and less grazing land than the west ranch, so the two of them make a balanced unit with the west ranch worth less per acre because the land is not as good and it has no hay land upon it.

In that connection, the actual value of plaintiffs' west ranch was fixed at an average of $17.54 an acre and the actual value of plaintiffs' east ranch was fixed at an average of $18.70 an acre for 1957. For that period the average assessed value of plaintiffs' west ranch was fixed at $6.36 an acre, upon which there was levied a tax averaging 23 cents an acre. On the other hand, the average assessed value of plaintiffs' east ranch was fixed at $6.53 an acre, upon which there was levied a tax averaging slightly more than 25 cents an acre. Primarily, plaintiffs' contention is that such values of their west ranch were too high as compared to their better east ranch and some other ranches in the area, and that both ranches were valued too high as compared with values placed on wet hay meadow and farm lands in the south half of the county, whereby plaintiffs were discriminated against. Plaintiffs' theory was that comparatively one acre of such lands should have been valued upon a ratio or equivalent of five acres of grazing land instead of two acres thereof, as was allegedly done by defendants. That contention cannot prevail because such wet hay meadow lands are generally part of farm lands and not

substantially similar to grazing lands. Also, wet hay meadow lands are not sold as such on the market except as a part of farm or ranch lands with which they were classified. Further, the reappraisal was made not only for the purpose of raising values but for the purpose of equalizing such lands with grazing lands, and there is ample evidence that the ratio as made by defendants was not discriminatory as claimed by plaintiffs.

Plaintiffs and other ranchers had an expert loan appraiser inspect their lands in Logan County and examine the assessments thereof. He began that work in October 1957, and spent 34 days doing so. He testified as a witness for plaintiffs that their west ranch was some below average in quality because it had about 400 acres of "go back" land which is now admittedly growing better, and had no hay land on it. His opinion was that the value of the west ranch was about $12 an acre, but that other ranch land in the area had a value of about $15 an acre. He testified that plaintiffs' east ranch was better because it had about 500 acres of subirrigated hay land and some "go back" on it, but that the rest of the land was common sandhill pasture except about 47 acres of sand blowout. His opinion was that without considering improvements, as was done by defendants, plaintiffs' east ranch was worth about $18 an acre because it was slightly better than other ranches in that area. He testified that valley hay land was worth about $75 an acre more or less, but that plaintiffs' hay land was not as good as valley hay land; that valley farm land in the south part of the county was worth about $65 to $70 an acre, but that for stated reasons it varied considerably in quality and value; that between 1955 and 1957 the value of farm lands was lowered about 30 percent by the committee, but ranch lands were raised in value about 40 to 50 percent for tax purposes; and that the average value of ranch land in the north half of the county was about $15 an acre while the average value of the wet hay land in the south half of the county was

an average of about $65 an acre, a ratio of about five to one, with farm lands having a ratio of about four to one. However, such opinion was not based on any actual sales. He admitted that the west ranch would pasture about one head of cattle per 20 acres, while the east ranch was a little better and would pasture about one head per 16 acres. He admitted that plaintiffs' lands were worth some more now than they were in 1948 and 1950, but that they were probably not worth much more; that loans by the Federal Land Bank had increased about 10 percent since 1945; that because of rains during the last 2 years, plaintiffs' lands were looking good now and hay cutting thereon was about half as good as that on valley land; that some of the valley lands were swampy and water logged; that he knew of no sales of land in the north half of the county near plaintiffs; and that his conclusion with reference to comparative ratios aforesaid was not necessarily based on any actual sales but was based simply upon his own opinion.

A retired rancher and owner of 8,520 acres, part of which was in Logan County, testified as a witness for plaintiffs. His lands consisted of grazing land, wet meadow land, and farm land, most of which is in the north half of the county and adjoins plaintiffs' west ranch on the south. Between 1955 and 1957 his farm land and wet hay land, which has quite a lot of swamp on it, was reduced in assessed value for tax purposes, but his grazing land was nearly doubled in value. His opinion was that average ranch land was worth about $15 an acre and average wet valley hay land was worth about $85 to $100 an acre, with average dry farm land worth about $65 an acre in 1957, which was about the same ratio as that given by plaintiffs' appraiser. He testified that he was familiar with plaintiffs' land; that the west ranch was a little below average in the area, but that the east ranch was fully as good or better than the average; and that in 1957 the west ranch was worth about $12.50 an acre and the east ranch was worth $20

an acre, without considering improvements thereon. He bought 920 acres adjoining his land on the east 3 years ago and paid $16 or $17 an acre for it. He also detailed the purchase of hay meadow, farm, and grass land in 1947 at a referee's sale for $28.22 an acre. Although he related other sales, he based his opinion mainly on what land he had purchased. He also has a suit like plaintiffs still pending in the district court for Logan County. He admitted that hay produced in the south valley is pretty rank, not the best quality or as good as hay raised in meadow lands in the hills during the wetter seasons; and that land values have risen on all types of land in the county.

. Another ranch owner of 7,680 acres in the county was called as a witness by plaintiffs. He also has a similar suit pending in the district court for Logan County. He testified that his grazing land compared with the average grazing land in the county, including plaintiffs, and that he was familiar with wet hay and farm land in the south part of the county, which in his opinion was worth from $80 to $100 an acre, and has a ratio in value of about four to one greater than grazing land in the north part of the county. Admittedly, he knew of no valley hay land sales as such, and that subirrigation would make a lot of difference in values. He was familiar with plaintiffs' west ranch, but never saw some of the east ranch. His opinion was that plaintiffs' west ranch was worth about $12 an acre.

A member of the county reappraisal committee was called as a witness for plaintiffs. He was the implement dealer heretofore mentioned and one of the committee who employed Wilkens to reappraise the county. He met with Wilkens four or five times when they talked dollar values that should be placed on the various classes and types of land. They drove out and looked at a hay meadow and agreed on a top value of $55 an acre for it. They also discussed the value of grazing land at one of the meetings, and he said that they set a top

value of $15 an acre on that type of land. However, another member of the committee denied that a top value of $15 an acre on grazing land was ever agreed upon. Rather, he said that it was $20 an acre, and that the implement dealer seldom attended meetings of the committee. Plaintiffs' witness aforesaid gave as his opinion that the land in the south part of the county had been valued fairly between various lands over the county.

The county assessor, as a witness for defendants, testified that during the last 12 years while serving as assessor he had traveled and walked over the entire county, including ranches and other lands in the county, almost every year to investigate and check the quality, quantity, and value of such lands for tax purposes, and that he had as assessor and register of deeds become acquainted with every land sale in the county for the last 12 years. During that period he had personally listed all such land transactions in the county and filed such land sales in the county. In doing so, he became so familiar with landowners and their land that if told their names he would immediately know the land they owned and lived on. As shown by sales before and during 1955, the condition of land values and assessments in the county showed great inequity between valuations of farm and wet hay land on the south side that were high in comparison with grazing land on the north side, which was assessed at a low figure. There are variations in the class and quality of hay meadows, but ranch land is pretty equal one with another. There have been no sales of wet hay land separately, but it is owned and used in connection with ranch and farm land and classified generally in connection therewith. His opinion was that wet hay meadow land was worth about $60 an acre, but that it was difficult to value, depending upon its topography and other elements, such as size of the ranch or farm connected with it, how badly it was needed, or how many cattle might or were run upon it, or how much hay land the owner already had, but that

all factors made $60 an acre a fair and reasonable value.

The assessor was familiar with plaintiffs' land. He had been over it about 50 times and was familiar with it since 1914. In 1955 he and the county board, after talking it over, considered it best to have a reappraisal in order to do away with inequities, so a reappraisal committee was duly appointed and approved and Wilkens was duly employed to make the appraisal, and they did so in parcels of 40-acre tracts on each owner's lands. When the card records thereof were all completed and the reappraisals were finished, such cards came to the assessor who prepared an extract from that information and his records, showing the 1955 and 1957 comparative actual values per acre, the assessed values per acre, the total tax, and the tax per acre. The appraisal cards relating to plaintiffs' land and the extract aforesaid appear as exhibits in the record. After the records were delivered to the assessor, he checked them against the lands which he had inspected and personally knew about, whereupon he made some changes and corrected some clerical errors. Thereafter he prepared his real estate book. In his opinion, the values were equally established as between lands in the county, and he accepted such valuations, using Wilkens' report as an aid, after making his own valuations. He was of the opinion that the valuations here involved were fair and equal between various lands in the county, taking into account the types and kinds of land, location thereof, situation as to roads and schools, topography, comparison with other land sales, a record of which appears in the evidence, and his own judgment based on his inspection of the lands and his knowledge of values.

The assessor's opinion was that plaintiffs' lands, considered as a unit, as they were used, had a reasonable market value of $25 to $30 an acre; that separately, plaintiffs' west ranch had a reasonable market value of $20 to $25 an acre; and that separately, plaintiffs' east ranch had a reasonable market value of $30 to $35 an

acre. In 1956, the assessor, the county attorney, and the county board as a board of equalization, went over plaintiffs' west ranch, 40 by 40. They also drove over the pasture on plaintiffs' east ranch, which was admittedly better than the west ranch, and took a good look at the east ranch, although they did not go over it 40 by 40. In 1955 the county committee assisted Wilkens in going over the whole county and setting values for equalization purposes. The assessor met with them occasionally until the reappraisal was completed. The assessor's opinion was that wet hay land, since there was no market for it separately, was not more valuable than farm land. His opinion was that all other land in the county had increased in market value during recent years, but that farm and wet hay land had stayed about the same while ranch land had sold quite regularly and gone up in price steadily. In that connection, he testified that in making the reappraisal Wilkens and the committee attempted to value all the lands at 80 percent of what it would sell for. The assessor did not change the values used in 1955, but he testified that the county board had direction from the State Board of Equalization and Assessment to raise and equalize the value of lands in Logan County.

A rancher for many years, who was a member of the reappraisal committee and owned 7,280 acres and a lease on one school section in Logan County, was called as a witness by defendants. He testified that hay lands had to be and generally were attached to some other land to be of value, and that they usually were so used and operated. He knew the lands in the county, having been over most of it, and as a member of the committee he and one other member thereof met with Wilkens about twice a week for 2 or 3 months whereat they discussed values and comparative values in attempting to equalize taxes in the county. They put such values in code form and on the reappraisal cards by agreement between Wilkens and the committee. They were with Wilkens

when values were placed on the lands and agreed thereto at such meetings in a room set aside for them in the courthouse. In doing so, they attempted to fix values as near as possible to sale value, bearing in mind fluctuations in price in order to make the appraisal last for more than one year. He testified that by agreement a value of $20 was fixed as top value for grazing land and $45 was fixed for meadow land; and that as Wilkens finished the appraisal cards, the committee checked them as they went along, section by section. Sometimes they went out and checked on the property and came to agreement. He and another member of such committee looked through all the appraisal cards and when that was all done gave them to the assessor. It was his opinion that grazing land section by section was valued at a comparable price and that the values of all lands had been adjusted fairly and equally without any discrimination between them. He so testified despite the fact that the tax values on his own grazing lands had been raised about 85 percent, and that it was properly so done by the reappraisal. He had been familiar with plaintiffs' ranches for 25 years. In his opinion, the value of plaintiffs' west ranch was $25 an acre; the value of plaintiffs' east ranch was $35 an acre; and that both ranches used as a unit were worth $30 an acre. He testified that described land comparable with plaintiffs sold 3 to 4 years ago for $25 an acre; that another sold within the last year for $30 an acre; and that another within the last 3 years sold for $28 an acre.

A farmer and rancher, who was another member of the reappraisal committee, was called as a witness by defendants. He had lived in that part of the country since 1907 and owned two sections of land in Logan County and some in McPherson County. He had owned some land in Logan County since 1917. He was generally familiar with all land in that county, and had been over plaintiffs' west ranch a great many times. He generally verified the testimony of the other member of the com-

mittee who testified for defendants. His opinion was that plaintiffs' west ranch was worth $25 an acre; that wet valley land in the county was worth $50 to $60 an acre; and that farm land was worth $30 to $65 an acre. He was not as familiar with plaintiffs' east ranch and had not been over it recently, so the court did not permit him to orally express his opinion on its value in 1957. He testified also that his own land had been doubled in valuation by the reappraisal, but that it was a fair valuation as compared to other lands in the county.

The chairman of the county board, who had been a member thereof since 1952, was called as a witness by defendants. He owns a cattle ranch in Logan County where he operates 8 or 9 thousand acres of land. He had lived on that land 39 years. His ranch has 5 to 6 hundred acres of meadow grass and alfalfa. There is some farm land on his ranch, but it is all planted to alfalfa and grass since 1950. He testified that the State Board of Equalization and Assessment had told the county officials that all real estate in Logan County would have to be equalized. Finding that a reappraisal by the assessor and county board was an impossible task, they consulted with other county boards and two or three different reappraisal companies. Upon the advice of the county attorney, the county board appointed a reappraisal committee in the spring of 1955 who, after investigation and consultation, recommended Wilkens, with whom a contract was made on April 4, 1955, to make an appraisal of county lands, and the county board approved the contract. An office was set up in the courthouse for Wilkens and the reappraisal committee. A code of valuation was then prepared and the county board went over it. He also knew about the reappraisal cards being made out by the appraisers. When those cards were completed they were informally brought to the board where in the presence of the county assessor some comparisons of land values were made. The reappraisal was completed in September or October 1955,

and the cards were given to the county assessor. The witness saw the assessor and his assistant use them to assist in fixing the 1956 schedules. Some changes were made in them. The witness was familiar with lands of the county, particularly on the west side. His opinion was that on March 1, 1957, the average value of grazing land was $25 to $30 an acre; that the average value of wet hay meadow land was $40 to $50 an acre; that farm land in the south and west was worth an average of about $40 an acre; and that the value of small areas of best farm land would fairly average $60 to $70 an acre. He knew of land sales in Logan County and the crops raised on the various types of land. He was familiar with plaintiffs' ranch, and operates land similar thereto in kind and value. He was on it and went over it pretty thoroughly in May or June 1956, to look at it as a member of the board of equalization, because a protest had been filed. The county assessor and county attorney went with the board. At that time they took out what had been fenced as blowouts, for which admittedly plaintiffs received $6 an acre, and the cost of fencing under the agricultural conservation program. The opinion of the commissioner was that on March 1, 1957, plaintiffs' west ranch had a fair and reasonable value of $28 an acre, and that plaintiffs' east ranch had a fair and reasonable value of $35 an acre. He testified that plaintiffs' west ranch land compared about the same as other grazing land in the north half of the county. His opinion, after looking at the land in the north part of the county, was that there was no discrimination; that there might be small inequities but nothing large; and that there was no discrimination as to one class of land against another in the whole county. In fixing the value of plaintiffs' land, he took into account its accessibility, its stock-carrying capacity, the number of cattle he had seen pastured, and what the land would sell for.

The assistant to the county assessor of adjoining Lincoln County since 1955 was called as a witness by de-

fendants. He had charge of real estate assessments in Lincoln County. Prior thereto he had been employed as a land appraiser and was supervisor of appraisers in various counties for Wilkens. He had gone over the past land sales in Logan County and had made pencilled notations on exhibits Nos. 26 through 32 appearing in this record, which notations represent the actual appraised value per acre and the percentage in comparison to the sale value of the properties shown on such records. By such comparison the appraised values per acre by percentages were in all cases less than the sale values. With regard to plaintiffs' lands, the actual value listed on the appraisal card was only 61.36 percent of a $30 unit valuation thereof, as given by defendants' witnesses.

In rebuttal, plaintiffs offered some evidence with regard to rental values of and rents paid for school land and other lands in the county, which rentals had generally increased during the last few years. We do not deem it necessary to recite that evidence here because it could not upon any theory change the result.

In the light of the authorities heretofore cited, and the evidence heretofore set forth, we conclude upon trial de novo that plaintiffs have failed to meet the burden of proof required of them. Therefore, the judgment of the trial court should be and hereby is affirmed. All costs are taxed to plaintiffs.

AFFIRMED.