Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/28/2022 09:04 AM CDT

Lancaster County Board of Equalization,
appellant, v. Brad Moser and
Mary Moser, appellees.

___ N.W.2d ___

Filed October 28, 2022.    No. S-21-774.

1. **Taxation: Judgments: Appeal and Error.** Appellate courts review decisions rendered by the Tax Equalization and Review Commission for errors appearing on the record.

2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. **Administrative Law: Judgments: Words and Phrases.** Agency action is arbitrary, capricious, and unreasonable if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion.

4. **Taxation: Valuation: Presumptions: Evidence.** A presumption exists that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. That presumption remains until there is competent evidence to the contrary presented.

5. **____: ____: ____: ____.** If the challenging party overcomes the presumption of validity by competent evidence, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all of the evidence presented.

6. **Taxation: Valuation: Proof: Appeal and Error.** The burden of showing that a valuation is unreasonable or arbitrary rests upon the taxpayer on appeal from the action of the board of equalization.

7. **Taxation: Valuation: Proof.** The burden of persuasion imposed on a complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the property, when compared with valuations

placed on other similar property, is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment.

8. **Taxation: Valuation: Words and Phrases.** Equalization is the process of ensuring that all taxable property is placed on the assessment rolls at a uniform percentage of its actual value. The purpose of equalization of assessments is to bring the assessment of different parts of a taxing district to the same relative standard, so that no one of the parts may be compelled to pay a disproportionate part of the tax.

9. **Taxation.** While absolute uniformity of approach for taxation may not be possible, there must be a reasonable attempt at uniformity.

10. **Taxation: Valuation: Constitutional Law.** The object of the uniformity clause is accomplished if all of the property within the taxing jurisdiction is assessed and taxed at a uniform standard of value.

11. **Taxation: Valuation: Public Policy.** No difference in the method of determining the valuation or rate of tax to be imposed can be allowed unless separate classifications rest on some reason of public policy or some substantial difference of situation or circumstance that would naturally suggest justice or expediency of diverse legislation with respect to the objects classified.

12. **Taxation: Valuation.** Generally, taxpayers are entitled to have their property assessed uniformly and proportionately, even though the result may be that it is assessed at less than the actual value.

13. **Taxation: Valuation: Proof.** The burden of proof is on the taxpayer to establish that the value of the property has not been fairly and proportionately equalized with all other properties, resulting in a discriminatory, unjust, and unfair assessment.

14. **Taxation: Valuation: Constitutional Law: Statutes.** The county board of equalization has a statutory duty to fairly and impartially equalize the values of all items of real property in the county so that all real property is assessed uniformly and proportionately. This statutory duty is informed, in turn, by the constitutional principles of uniformity and proportionality set out in Neb. Const. art. VIII, § 1.

15. **Taxation: Valuation: Constitutional Law.** In carrying out its duty to correct and equalize individual discrepancies and inequalities in assessments within the county, a county board of equalization must give effect to the constitutional requirement that taxes be levied uniformly and proportionately upon all taxable property in the county.

16. ____: ____: ____. The rule of uniformity applies to both the rate of taxation and the valuation of property.

17. **Taxation: Valuation: Constitutional Law: Intent.** When property owners contend their property has been disproportionately valued as

compared to other comparable property, such contention must be sustained by evidence that the valuation is arbitrary or capricious, or so wholly out of line with actual values as to give rise to an inference that the assessor and county board of equalization have not properly discharged their duties. Mere errors of judgment do not sustain a claim of discrimination. There must be something more, something which in effect amounts to an intentional violation of the essential principle of practical uniformity.

Appeal from the Tax Equalization and Review Commission. Reversed and remanded with directions.

Patrick Condon, Lancaster County Attorney, and Daniel J. Zieg for appellant.

David C. Solheim, of Solheim Law Firm, for appellees.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.
In 2018, 2019, and 2020, Mary Moser and Brad Moser protested the valuation of their agricultural land, and the Lancaster County Board of Equalization (County Board) affirmed the valuations. The Mosers appealed to the Tax Equalization and Review Commission (TERC), and after a consolidated evidentiary hearing, TERC affirmed the County Board's decision regarding the 2020 tax year, but reversed its decisions for the 2018 and 2019 tax years. For both 2018 and 2019, TERC reduced the value of the Mosers' irrigated acres to equalize those acres with a nearby parcel of agricultural property. The County Board timely petitioned for review of TERC's decision,[1] and we moved the case to our docket. We now reverse the decision of TERC and remand the matter with directions to affirm the decision of the County Board.

---

[1] See Neb. Rev. Stat. § 77-5019(2)(a)(i) (Reissue 2018).

## I. BACKGROUND

The facts in this matter are largely undisputed. The Mosers own approximately 116 acres of agricultural land located in Lancaster County. The parcel number of the subject property is 02-36-400-001-000, and it is referred to by the parties as "Mary's Farm."

At all relevant times, Mary's Farm was classified as unimproved agricultural land, and the acres were inventoried into different subclasses.[2] During the 2018, 2019, and 2020 tax years, Mary's Farm had a center pivot irrigator, so some of the acres were subclassified as irrigated cropland. Other acres were subclassified as dryland cropland, grassland, and wasteland. Under the assessment methodology and schedule of values used by Lancaster County during the relevant tax years, the actual value of an acre of irrigated cropland was higher than the actual value of an acre of dryland cropland, grassland, and wasteland, but all subclasses were assessed at the same percentage of actual value.[3]

### 1. 2018 Protest

For tax year 2018, the Lancaster County assessor determined the taxable value of Mary's Farm was $612,500. This valuation was based in part on property records subclassifying 88.09 of the acres as irrigated cropland. In protesting the 2018 valuation, the Mosers focused on the acres of irrigated cropland, asserting that "[c]omparable ground 1 mile west is valued much lower than this property." As authorized by Neb. Rev. Stat. § 77-1502.01 (Reissue 2018), the County Board used a referee to hear the protest.

---

[2] See, generally, Neb. Rev. Stat. § 77-1363 (Cum. Supp. 2020) (requiring agricultural and horticultural land to be divided into classes and subclasses for purposes of valuation, including, but not limited to, irrigated cropland, dryland cropland, grassland, wasteland, nursery, feedlot, or orchard); *Betty L. Green Living Trust v. Morrill Cty. Bd. of Equal.*, 299 Neb. 933, 911 N.W.2d 551 (2018).

[3] See, generally, Neb. Rev. Stat. § 77-201(2) (Reissue 2018) (agricultural land "shall be valued at seventy-five percent of its actual value").

In support of their protest, the Mosers submitted the 2018 property record for a neighboring parcel of agricultural land, referred to by the parties as the "Morrison property." This evidence showed the Morrison property had been classified as improved agricultural land, with some acres subclassified as dryland cropland and other acres subclassified as grassland and wasteland. The Morrison property record did not show any acres of irrigated cropland, but the Mosers claimed that the Morrison property had two center pivot irrigators. In support, they offered a "Google Earth" image which purportedly showed center pivot irrigators, but no crop circles, in a field represented to be the Morrison property. Based on that evidence, the Mosers argued that Mary's Farm and the Morrison property were "comparable in soil type and both have irrigated and dryland acres." They argued that because the irrigated acres on the Morrison property had been subclassified and valued as dryland, the irrigated acres on Mary's Farm should be revalued as dryland, too.

The referee rejected the Mosers' argument, reasoning that the evidence adduced did not support a reduction in the valuation of the irrigated acres of Mary's Farm. The County Board agreed with the referee. However, pursuant to an unrelated 2017 settlement between the Mosers and TERC, the County Board reduced the 2018 assessed value of Mary's Farm to $598,900.

## 2. 2019 PROTEST

A similar protest process occurred in 2019. In that year, the county assessor determined the taxable value of Mary's Farm was $570,300, based in part on 90.69 acres which were subclassified and valued as irrigated cropland. The Mosers filed a protest, again asking that their irrigated cropland be valued as dryland. In support, they provided the 2019 property record file for the Morrison property, which again showed that none of the acres on the Morrison property were subclassified or valued as irrigated cropland. The Mosers also provided color

photographs of an operating center pivot in a cropfield they represented was part of the Morrison property. And, as they had done in 2018, the Mosers asked that the irrigated cropland on Mary's Farm be revalued as dryland cropland.

After reviewing the evidence provided by the Mosers, the referee found that the Morrison property was "irrigated by 2 pivots[,] but taxed as dryland," and recommended that the assessor's data on the Morrison property be corrected. However, the referee concluded that the error in subclassifying and valuing the Morrison property did "**not support a valuation error** within [the] current assessment" of Mary's Farm. The County Board agreed with the referee and affirmed the assessor's 2019 valuation of Mary's Farm.

### 3. 2020 Protest

For the 2020 tax year, the assessor determined the taxable value of Mary's Farm was $551,300. The Mosers protested this valuation, but this time they did not challenge the valuation of the irrigated acres. Instead, they argued that their wasteland acres were valued higher than wasteland acres in surrounding counties. In support, the Mosers offered information on the standard land values for the different subclasses and soil types in Saline County. The referee concluded that the information provided by the Mosers did not support a valuation error with the current assessment of Mary's Farm. The County Board agreed with the referee and affirmed the assessor's 2020 valuation.

### 4. TERC Appeal

The Mosers appealed the 2018, 2019, and 2020 valuations of Mary's Farm to TERC, and a consolidated evidentiary hearing was held on April 5, 2021. Mary testified on behalf of the Mosers. She explained that in 2018 and 2019, they protested the valuation of the irrigated acres on Mary's Farm because the Morrison property was located nearby and was "valued so much lower than ours." In support, Mary offered the evidence,

described above, that the Mosers had presented to the County Board in 2018 and 2019 regarding pivot irrigators on the Morrison property. Mary testified that the Morrison property records for 2018 and 2019 did not show that any portion of the Morrison property was irrigated, and she asked that the property record for Mary's Farm be changed to "also reflect non-irrigated land," because that would be "equal."

Derrick Niederklein, the chief field deputy for the Lancaster County assessor's office, testified on behalf of the County Board. Niederklein testified that in 2018 and 2019 the assessor's office did not know the Morrison property had any irrigated acres. He explained that usually, a property owner reports adding a pivot irrigator,[4] and the assessor's office also uses aerial and oblique imagery to identify pivots. Niederklein testified that "leaving the pivot off the Morrisons' property [was] not an intentional act by the assessor's office." He admitted that it was "not uncommon" for the assessor's office to learn that something was incorrect in its property records because conditions can change from year to year, but he testified that generally, the property records were "accurate." Niederklein also testified that beginning in the 2020 tax year, the irrigated acres on the Morrison property were correctly subclassified and valued as irrigated cropland.

In an order entered on August 24, 2021, TERC made a finding that the irrigated acres on the Morrison property were "comparable to irrigated acres" on Mary's Farm. TERC further found that the documents the Mosers had submitted to the County Board during their 2018 and 2019 protests provided "compelling evidence" that the Morrison property had pivot irrigation, even though the county's property records for 2018 and 2019 did not show that any portion of the Morrison property was irrigated. TERC recited the rule that

---

[4] See Neb. Rev. Stat. § 77-1318.01(1) (Reissue 2018) (requiring owner of real property to report improvement valued at $2,500 or more to assessor).

[i]f taxable values are to be equalized it is necessary for a Taxpayer to establish by clear and convincing evidence that the valuation placed on the property[,] when compared with valuations placed on other similar properties[,] is grossly excessive and is the result of systematic exercise of intentional will or failure of plain legal duty, and not mere errors of judgment.[5]

TERC then reasoned:

> In the context of an appeal to this Commission, the systematic exercise of intentional will or failure of a plain duty is that of the County Board, not the County Assessor. During the protest process, the [Mosers] presented the County Board with clear evidence that the Morrison Farm included irrigated land that was not being assessed as irrigated land. At that point, the County Board had a plain legal duty to equalize the assessments, even though the result may have been that [Mary's Farm] was assessed at less than the actual value.

Based on this reasoning, TERC found there was clear and convincing evidence that the County Board's decisions in 2018 and 2019 were arbitrary or unreasonable. TERC ordered that the irrigated acres on Mary's Farm must be revalued as dryland for both the 2018 and 2019 tax years. Using the county assessor's scheduled value for dryland cropland, TERC reduced the total assessed value of Mary's Farm by $125,715 for 2018 and by $119,605 for 2019.

TERC concluded that no equalization was necessary for the 2020 tax year "[b]ecause the irrigated parcels on the Morrison farm were assessed as irrigated land" for that tax year. Additionally, TERC rejected the Mosers' contention that they were entitled to have any subclass of agricultural land in Lancaster County equalized with comparably subclassified property in Saline County, reasoning that the scheduled values

---

[5] See *Newman v. County of Dawson*, 167 Neb. 666, 94 N.W.2d 47 (1959).

in another taxing district did not constitute sufficient evidence that the assessment of the Mosers' property was incorrect, arbitrary, or unreasonable.

## 5. Petition for Judicial Review

The County Board filed this timely petition for judicial review in the Nebraska Court of Appeals.[6] The petition challenges only TERC's decision to reduce the valuation of Mary's Farm for the 2018 and 2019 tax years. We moved the matter to our docket on our own motion.

## II. ASSIGNMENTS OF ERROR

The County Board assigns, restated, that TERC erred in reducing the valuation of Mary's Farm because there was not clear and convincing evidence that the value, when compared to similar property, was grossly excessive and was the result of a systematic exercise of intentional will or failure of plain legal duty and not mere errors of judgment.

## III. STANDARD OF REVIEW

[1-3] Appellate courts review decisions rendered by TERC for errors appearing on the record.[7] When reviewing a judgment for errors appearing on the record, an appellate court's inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.[8] Agency action is arbitrary, capricious, and unreasonable if it is taken in disregard of the facts or circumstances of the case, without some basis which would lead a reasonable and honest person to the same conclusion.[9]

---

[6] See § 77-5019.

[7] *Wheatland Indus. v. Perkins Cty. Bd. of Equal.*, 304 Neb. 638, 935 N.W.2d 764 (2019).

[8] *Id.*

[9] *Id.*

## IV. ANALYSIS

The ultimate question presented in this appeal is whether TERC's decision to revalue the irrigated cropland on Mary's Farm as dryland cropland conformed to the law, was supported by competent evidence, and was neither arbitrary, capricious, nor unreasonable.[10] Before addressing that question, we first review the taxpayer's burden of proof in an appeal before TERC. We then review the foundational principles of taxing agricultural land in Nebraska, as well as the constitutional requirements of uniformity and proportionality that govern our analysis.

### 1. Presumption of Validity and Burden of Proof

When reviewing appeals from decisions of county boards of equalization, TERC must follow the standard set out in Neb. Rev. Stat. § 77-5016(9) (Reissue 2018), which provides:

> In all appeals, excepting those arising [from a county tax levy], if the appellant presents no evidence to show that the order, decision, determination, or action appealed from is incorrect, [TERC] shall deny the appeal. If the appellant presents any evidence to show that the order, decision, determination, or action appealed from is incorrect, such order, decision, determination, or action shall be affirmed unless evidence is adduced establishing that the order, decision, determination, or action was unreasonable or arbitrary.

[4,5] We have held that the language of § 77-5016(9) creates a presumption in an appeal to TERC that a board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action.[11] That presumption remains until there is

---

[10] See *id.*

[11] E.g., *Wheatland Indus., supra* note 7; *Betty L. Green Living Trust, supra* note 2; *JQH La Vista Conf. Ctr. v. Sarpy Cty. Bd. of Equal.*, 285 Neb. 120, 825 N.W.2d 447 (2013); *Brenner v. Banner Cty. Bd. of Equal.*, 276 Neb. 275, 753 N.W.2d 802 (2008); *Ideal Basic Indus. v. Nuckolls Cty. Bd. of Equal.*, 231 Neb. 653, 437 N.W.2d 501 (1989).

competent evidence to the contrary presented.[12] If the challenging party overcomes the presumption of validity by competent evidence, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all of the evidence presented.[13]

[6,7] The burden of showing that a valuation is unreasonable or arbitrary rests upon the taxpayer on appeal from the action of the board.[14] And the burden of persuasion imposed on a complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed upon the property, when compared with valuations placed on other similar property, is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment.[15]

## 2. Taxation of Agricultural Land

Mary's Farm and the Morrison property are both classified as agricultural land.[16] According to § 77-1363, agricultural land is to be inventoried and valued by class and subclass:

Agricultural land and horticultural land shall be divided into classes and subclasses of real property under section 77-103.01, including, but not limited to, irrigated cropland, dryland cropland, grassland, wasteland, nurseries, feedlots, and orchards, so that the categories reflect uses appropriate for the valuation of such land according to law. Classes shall be inventoried by subclasses of real property based on soil classification standards developed by the Natural Resources Conservation Service of the United States Department of Agriculture as

---

[12] *Id.*

[13] See *Wheatland Indus., supra* note 7. See, also, *Betty L. Green Living Trust, supra* note 2; *JQH La Vista Conf. Ctr., supra* note 11.

[14] See *id.*

[15] *Id.*

[16] See § 77-201 and Neb. Rev. Stat. § 77-1359 (Reissue 2018).

converted into land capability groups by the Property Tax Administrator. Land capability groups shall be Natural Resources Conservation Service specific to the applied use and not all based on a dryland farming criterion. County assessors shall utilize soil surveys from the Natural Resources Conservation Service of the United States Department of Agriculture as directed by the Property Tax Administrator. Nothing in this section shall be construed to limit the classes and subclasses of real property that may be used by county assessors or the Tax Equalization and Review Commission to achieve more uniform and proportionate valuations.

And according to Neb. Rev. Stat. § 77-103.01 (Reissue 2018):

Class or subclass of real property means a group of properties that share one or more characteristics typically common to all the properties in the class or subclass, but are not typically found in the properties outside the class or subclass. Class or subclass includes, but is not limited to, the classifications of agricultural land or horticultural land listed in section 77-1363 . . . .

It is undisputed that during the 2018 and 2019 tax years, the irrigated acres on Mary's Farm were correctly subclassified as irrigated cropland, while the irrigated acres on the Morrison property were erroneously subclassified as dryland cropland. It is also undisputed that the erroneous subclassification of the Morrison property resulted in a lower assessed value than if the acres had been correctly subclassified as irrigated cropland. We find no prior cases in our equalization jurisprudence presenting a similar fact pattern. To analyze the duty of the County Board under these unique facts, we rely on settled principles of uniform and proportionate taxation.

### 3. Uniform and Proportionate Taxation

Uniform and proportionate taxation, sometimes referred to as "equalization," is a constitutional requirement in Nebraska. Article VIII, § 1(1), of the Nebraska Constitution provides in relevant part that "[t]axes shall be levied by valuation

uniformly and proportionately upon all real property . . . except as otherwise provided in or permitted by this Constitution." And article VIII, § 1(4), governs how agricultural and horticultural land is to be uniformly and proportionately valued and taxed. It provides:

> [T]he Legislature may provide that agricultural land and horticultural land, as defined by the Legislature, shall constitute a separate and distinct class of property for purposes of taxation and may provide for a different method of taxing agricultural land and horticultural land which results in values that are not uniform and proportionate with all other real property and franchises *but which results in values that are uniform and proportionate upon all property within the class of agricultural and horticultural land*.[17]

[8] We have explained the process and purpose of equalization as follows:

> "Equalization is the process of ensuring that all taxable property is placed on the assessment rolls at a uniform percentage of its actual value. The purpose of equalization of assessments is to bring the assessment of different parts of a taxing district to the same relative standard, so that no one of the parts may be compelled to pay a disproportionate part of the tax."[18]

[9-12] We have also recognized that while "absolute uniformity of approach for taxation may not be possible, there must be a reasonable attempt at uniformity."[19] The object of the uniformity clause is accomplished "'if all of the property within the taxing jurisdiction is assessed and taxed at a uniform standard of value.'"[20] No difference in the method

---

[17] Neb. Const. art. VIII, § 1(4) (emphasis supplied).

[18] *Krings v. Garfield Cty. Bd. of Equal.*, 286 Neb. 352, 357, 835 N.W.2d 750, 754 (2013), quoting *Brenner, supra* note 11.

[19] *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 873, 606 N.W.2d 786, 792 (2000).

[20] *Id.* at 873, 606 N.W.2d at 792, quoting *County of Gage v. State Board of Equalization & Assessment*, 185 Neb. 749, 178 N.W.2d 759 (1970).

of determining the valuation or rate of tax to be imposed can be allowed unless "separate classifications rest on some reason of public policy or some substantial difference of situation or circumstance that would naturally suggest justice or expediency of diverse legislation with respect to the objects classified."[21] Generally, taxpayers are entitled to have their property assessed uniformly and proportionately, even though the result may be that it is assessed at less than the actual value.[22]

In this case, we consider an issue of first impression in Nebraska: whether constitutional principles of uniform and proportionate taxation require that an isolated error in the subclassification and undervaluation of one taxpayer's property must be replicated through the equalization process. As we explain, we find no such requirement in the Nebraska Constitution, Nebraska statutes, or Nebraska case law.

## 4. Facts and Law Do Not Support TERC's Decision

### (a) Presumption of Validity

In any appeal before TERC, the threshold determination should be whether the taxpayer presented competent evidence to rebut the presumption of validity in favor of the board of equalization.[23] Here, TERC made an express finding that the Mosers had presented "competent evidence to rebut the presumption that the County Board faithfully performed its duties and had sufficient competent evidence to make its determination." In arriving at this conclusion, TERC did not find any error in the assessor's valuation of Mary's Farm. Rather, TERC concluded the Mosers had presented "compelling evidence of pivot irrigation on the Morrison farm" in 2018 and 2019 and had shown that the assessor's property records for those years taxed the Morrison property as dryland cropland.

---

[21] *Constructors, Inc., supra* note 19, 258 Neb. at 874, 606 N.W.2d at 793.

[22] *Constructors, Inc., supra* note 19.

[23] See *Wheatland Indus., supra* note 7.

As such, we understand TERC to have concluded that the presumption of validity was rebutted by photographic evidence that the Morrison property contained irrigated cropland that was erroneously valued as dryland cropland.

The County Board has not challenged TERC's conclusion that the Mosers' evidence sufficiently rebutted the presumption, and we express no opinion in that regard. Because, as we explain next, even if the Mosers' evidence was sufficient to rebut the presumption of validity, they did not ultimately satisfy their burden to prove by clear and convincing evidence that the valuation of Mary's Farm was unreasonable or arbitrary.[24]

### (b) Mosers Did Not Meet Burden of Proof

To prove the value placed on Mary's Farm was unreasonable or arbitrary,[25] the Mosers had to show that when compared to the valuations placed on similar property, the valuation of Mary's Farm was grossly excessive *and* was the result of either a systematic exercise of intentional will or the failure of a plain legal duty, and not a mere error of judgment.[26]

### (i) Grossly Excessive Valuation

We question whether the Mosers proved by clear and convincing evidence that the valuation of their irrigated acres was grossly excessive when compared to similar property. We agree the Mosers' evidence showed that the irrigated acres on Mary's Farm were valued higher than the irrigated acres on the Morrison property. But the Mosers did not compare the irrigated acres on Mary's Farm to any of the irrigated acres in the taxing district which, like their property, had been subclassified and valued as irrigated cropland. Instead, they compared their valuation to the valuation of irrigated acres which had been erroneously subclassified and valued as dryland cropland.

---

[24] See § 77-5016(9).

[25] See *id.*

[26] See *Betty L. Green Living Trust, supra* note 2.

But even if we set aside the different land classification groups of Mary's Farm and the Morrison property and assume, without deciding, that the Mosers proved their valuation was grossly excessive when compared to similar property, we nevertheless conclude they failed to prove their valuation was the result of either a systematic exercise of intentional will or the failure of a plain legal duty, and not a mere error of judgment.[27]

### (ii) Insufficient Evidence of Systematic or Intentional Action

The Mosers offered no evidence of a systematic or intentional misclassification and undervaluation of irrigated acres in Lancaster County. Instead, they offered evidence of a single parcel—the Morrison property—where irrigated cropland had been erroneously subclassified and valued as dryland. And it was undisputed that such error was unintentional and resulted from an improvement to the property of which the assessor's office was unaware, despite its use of aerial and oblique imagery to identify pivot irrigators. The evidence also showed that when the county became aware of the erroneous subclassification via the Mosers' tax protests, the error was corrected for the 2020 tax year. On this record, the Mosers failed to prove the valuation was the result of a systematic exercise of intentional will.

### (iii) No Plain Legal Duty to Equalize Mary's Farm and Morrison Property

Similarly, the Mosers did not carry their burden of proving that the valuation of Mary's Farm resulted from the failure of a plain legal duty and not a mere error of judgment. TERC's order did not explain why it determined the County Board had "a plain legal duty to equalize the assessments" by revaluing the irrigated acres on Mary's Farm as dryland cropland. But in its appellate briefing, TERC argues that once the Mosers presented evidence that their irrigated acres were assessed at

---

[27] See *id.*

a higher value than the irrigated acres on the Morrison property, it "trigger[ed] a duty to equalize."[28] We thus understand TERC to contend that these circumstances implicated constitutional principles of uniform and proportionate taxation. On this record, we disagree.

TERC appears to have ignored the fact that a subclassification error regarding the Morrison property was the reason for the disparate valuations, but we cannot. When determining whether principles of uniformity and proportionality have been violated by disparate valuations, we have said it is appropriate to consider the reasons offered for "why a particular valuation is what it is" because, without such context, evidence of disparate valuations "indicates nothing."[29] Here, the irrigated acres on the Morrison property were valued lower because they had been erroneously subclassified as dryland. It was that error in subclassification, and only that error, which caused the disparate valuation about which the Mosers complain.

[13-15] The burden of proof is on the taxpayer to establish that the value of the property has not been fairly and proportionately equalized with all other properties, resulting in a discriminatory, unjust, and unfair assessment.[30] The county board of equalization has a statutory duty to "fairly and impartially equalize the values of all items of real property in the county so that all real property is assessed uniformly and proportionately."[31] This statutory duty is informed, in turn, by the constitutional principles of uniformity and proportionality set out in Neb. Const. art. VIII, § 1. In carrying out its duty to correct and equalize discrepancies and inequalities in assessments within the county, a county board of equalization "'must give effect to the constitutional requirement that taxes be

---

[28] Brief for appellee at 8.

[29] *County of Franklin v. Tax Equal. & Rev. Comm.*, 296 Neb. 193, 201, 892 N.W.2d 142, 147 (2017).

[30] *Lincoln Tel. & Tel. Co. v. County Board of Equalization*, 209 Neb. 465, 308 N.W.2d 515 (1981).

[31] Neb. Rev. Stat. § 77-1501 (Reissue 2018).

levied uniformly and proportionately upon all taxable property in the county.'"[32] We see no evidence that these constitutional principles were implicated by the County Board's decision to affirm the valuation of Mary's Farm.

[16] The rule of uniformity applies to both the rate of taxation and the valuation of property.[33] And the object of the uniformity clause is accomplished "'if all of the property within the taxing jurisdiction is assessed and taxed at a uniform standard of value.'"[34] The evidence presented in this case and relied upon by TERC showed that in 2018 and 2019, all agricultural land within the taxing district was assessed and taxed at a uniform standard of value based on land classification group and soil type. Under that methodology, which no one challenges as unreasonable or arbitrary, the scheduled value of an acre of dryland cropland was lower than the scheduled value of an acre of irrigated cropland of the same soil type. The same assessment methodology was applied to both Mary's Farm and the Morrison property, but due to an unknown improvement on the Morrison property, the irrigated acres on that property were mistakenly subclassified and valued as dryland cropland in 2018 and 2019. As such, this case does not present a uniformity problem; rather, it presents a classification problem that equalization would exacerbate, not correct.

[17] A property owner's contention that property has been disproportionately valued as compared to other comparable property

> must be sustained by evidence that the valuation is arbitrary or capricious, or so wholly out of line with actual values as to give rise to an inference that the assessor and county board of equalization have not properly discharged their duties. Mere errors of judgment do not

---

[32] *Krings, supra* note 18, 286 Neb. at 358, 835 N.W.2d at 754.

[33] *Gordman Properties Co. v. Board of Equal.*, 225 Neb. 169, 403 N.W.2d 366 (1987).

[34] *Constructors, Inc., supra* note 19, 258 Neb. at 873, 606 N.W.2d at 792.

sustain a claim of discrimination. There must be something more, something which in effect amounts to an intentional violation of the essential principle of practical uniformity.[35]

Here, there was no evidence of something more. The only reason for the lower valuation of the irrigated acres on the Morrison property was that the cropland had been erroneously subclassified and valued as dryland because the assessor's office was unaware the parcel had center pivots. Our record contains no evidence of an intentional violation of the essential principles of uniformity or proportionality and no evidence that would give rise to an inference that either the assessor's office or the County Board failed to properly discharge its duties under the law.

We reject TERC's suggestion that constitutional principles of uniformity and proportionality require a county board of equalization to replicate what has been shown to be an isolated and unintentional error in the subclassification and undervaluation of one taxpayer's property. Were we to adopt such a rule, it would have far-reaching consequences to our equalization jurisprudence. As the County Board argues:

> Under [TERC's] order, all a taxpayer must do is locate a single unknown or unreported improvement to receive a reduction on their property value. A taxpayer with a finished basement would only need to locate a single house with a finished basement that is unknown to a county assessor and by the TERC's standard, the taxpayer would have met their burden for proving a lack of equalization. Similarly, a residence that is built and unreported to a county assessor would result in all improvements being removed from the assessment roll under the TERC's standard.[36]

And we generally agree with the County Board's observation that by ordering equalization in response to evidence that a

---

[35] *Newman, supra* note 5, 167 Neb. at 672, 94 N.W.2d at 50.

[36] Brief for appellant at 10-11.

single irrigated parcel was misclassified and thus undervalued, "TERC created two parcels that are undervalued [and] impermissibly shifted the tax burden to every other irrigated parcel that did not protest."[37]

The dissent suggests the County Board had a plain legal duty to value the irrigated acres on Mary's Farm as dryland under the reasoning of the U.S. Supreme Court in *Sioux City Bridge v. Dakota County*.[38] In that case, the Court was reviewing a decision of the Nebraska Supreme Court which had affirmed the denial of a tax protest over the valuation of a bridge in Dakota County.[39] The bridge company had argued it was entitled to have the valuation of the bridge reduced to 55 percent of its true value because "other property in the district [was] assessed at 55 [percent] of its true value."[40] The Nebraska Supreme Court rejected that argument and held that "when property is assessed at its true value, and other property in the district is assessed below its true value, the proper remedy is to have the property assessed below its true value raised, rather than to have the property assessed at its true value reduced."[41] The U.S. Supreme Court granted certiorari and reversed.[42] Relying on the Due Process and Equal Protection Clauses of the 14th Amendment to the U.S. Constitution, the Supreme Court reasoned it was "utterly impossible for [the protesting taxpayer] by any judicial proceeding to secure an increase in the assessment of the great mass of under-assessed property in the taxing district."[43] The Court held that under such circumstances, "the right of the taxpayer whose property alone is

---

[37] *Id.* at 9.

[38] *Sioux City Bridge v. Dakota County*, 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923).

[39] *Sioux City Bridge Co. v. Dakota County,* 105 Neb. 843, 182 N.W. 485 (1921).

[40] *Id.* at 848, 182 N.W. at 487.

[41] *Id.*

[42] *Sioux City Bridge, supra* note 38.

[43] *Id.*, 260 U.S. at 446.

taxed at 100 [percent] of its true value is to have [the] assessment reduced to the percentage of that value at which others are taxed even though this is a departure from the requirement of the statute."[44]

*Sioux City Bridge* is readily distinguishable from this case. First, the holding was grounded in the 14th Amendment, not the uniformity clause of the Nebraska Constitution, and we do not understand the Mosers to have raised or preserved a due process or equal protection claim in this case. Moreover, the underassessment of property in *Sioux City Bridge* was intentional and systematic—the bridge was being taxed at 100 percent of its actual value, while the "great mass"[45] of property in the district was being taxed at 55 percent of its actual value. That is nothing like the situation here, where the evidence showed that dryland cropland and irrigated cropland were taxed at the same percentage of actual value, and the same assessment methodology and uniform valuation standards were applied to all agricultural land in the taxing district. And finally, although the taxpayer in *Sioux City Bridge* apparently had no way to secure an increase in the intentionally underassessed property, the Mosers point to nothing that prevented them from protesting the misclassification of the irrigated acres on the Morrison property.[46] Indeed, the record indicates that the Mosers' protests resulted in correcting the misclassification of irrigated acres on the Morrison property for the 2020 tax year. We are not persuaded that the holding or the reasoning in *Sioux City Bridge* has application here.

The dissent also relies on a settled proposition from our equalization jurisprudence which states, """"The constitution forbids any discrimination whatever among taxpayers, thus, if the property of one citizen is valued for taxation at one-fourth

---

[44] *Id.*

[45] *Id*.

[46] See Neb. Rev. Stat. § 77-1502 (Cum. Supp. 2022) (directing county clerk to mail copy of protest to owner when person filing protest is not owner of property).

its value, others within the taxing district have the right to demand that their property be assessed on the same basis.""""[47] But this proposition is not implicated here either, because the Mosers' property and the Morrison property were both assessed at the same percentage of actual value based on subclassification. Again, the only reason shown for the valuation differences between these two properties was their different subclass. And we do not understand the dissent to be suggesting that constitutional principles of uniformity and proportionality are offended by a tax assessment methodology under which each subclass of agricultural land has a different scheduled actual value. The Mosers have not shown unconstitutional discrimination in the valuation of their property as compared to the Morrison property.

We find no principled support for TERC's conclusion that an unintentional error in subclassifying the Morrison property as dryland cropland imposed on the County Board a plain legal duty to replicate that error through equalization by applying a factually false subclassification to reduce the valuation of the cropland on Mary's Farm.

We instead conclude, on this record, that the Mosers failed to prove by clear and convincing evidence that the valuation of Mary's Farm, when compared to the valuation of similar property, was grossly excessive and was the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment.[48] Nor did the Mosers adduce sufficient evidence to establish that the County Board's decision to affirm the Mosers' assessments in 2018 and 2019 was unreasonable or arbitrary.[49]

---

[47] *Gamboni v. County of Otoe*, 159 Neb. 417, 435, 67 N.W.2d 489, 501 (1954), *overruled in part on other grounds, Hansen v. County of Lincoln*, 188 Neb. 461, 197 N.W.2d 651 (1972). See *State v. Savage*, 65 Neb. 714, 91 N.W. 716 (1902).

[48] See, *Betty L. Green Living Trust, supra* note 2; *JQH La Vista Conf. Ctr., supra* note 11.

[49] See § 77-5016(9).

TERC's conclusion that the County Board had a plain legal duty to equalize the 2018 and 2019 assessments by treating irrigated cropland on Mary's Farm as dryland cropland was factually incorrect, was not supported by competent evidence, failed to conform to the law, was unreasonable, and must be reversed.[50]

## V. CONCLUSION

For the foregoing reasons, we reverse TERC's decision to the extent it ordered that the irrigated cropland on Mary's Farm be valued as dryland cropland for the 2018 and 2019 tax years, and we remand the matter with directions to affirm the County Board's assessments on parcel 02-36-400-001-000 for both tax years.

Reversed and remanded with directions.

---

[50] See *Wheatland Indus., supra* note 7.

Cassel, J., dissenting.

Although the majority concedes that irrigated acres on the Morrison property were incorrectly classified as dryland and that as a result, the Morrison property was erroneously given a lower value than the comparable property of Brad Moser and Mary Moser, the majority concludes that this triggered no plain duty to equalize the two properties. I respectfully disagree. The Nebraska Constitution compels otherwise.

Neb. Const. art. VIII, § 1(4), plainly commands that properties within the class of agricultural land and horticultural land must be equalized despite being in separate subclasses. The majority effectively holds that an error in subclassification relieved the county board of its duty to equalize. This court thereby fails to enforce the plain duty imposed by the constitution.

For the sake of completeness, and at the risk of some duplication of the majority opinion, I set forth this plain constitutional language, the principle commanding adherence to the constitutional mandate, and the history of the uniformity clause and the amendments permitting separate classification

of agricultural land and horticultural land. The majority here effectively deprives an agriculturalland taxpayer of any remedy for the misclassification of comparable agricultural property. Because the organic law of this state requires the action taken by the Tax Equalization and Review Commission (TERC), I respectfully dissent.

For convenience, I refer generally to the language of article VIII, § 1, as the uniformity clause. Insofar as it relates to the case before this court, the uniformity clause states as follows:

> The necessary revenue of the state and its governmental subdivisions shall be raised by taxation in such manner as the Legislature may direct. Notwithstanding Article I, section 16, Article III, section 18, or Article VIII, section 4, of this Constitution or any other provision of this Constitution to the contrary: (1) Taxes shall be *levied by valuation uniformly and proportionately upon all real property and franchises as defined by the Legislature except as otherwise provided in or permitted by this Constitution*; [and] (4) the Legislature may provide that *agricultural land and horticultural land*, as defined by the Legislature, *shall constitute a separate and distinct class of property for purposes of taxation* and may provide for a different method of taxing agricultural land and horticultural land which results in *values that are not uniform and proportionate with all other real property and franchises but which results in values that are uniform and proportionate upon all property within the class of agricultural land and horticultural land*; . . . Each actual property tax rate levied for a governmental subdivision shall be the same for all classes of taxed property and franchises.[1]

To the extent pertinent here, one can readily discern that § 1 addresses uniformity in two clauses. First, § 1(1) imposes a general duty to levy taxes by valuation uniformly and proportionately upon all real property except as otherwise allowed by the Nebraska Constitution. Then, § 1(4) permits classification

---

[1] Neb. Const. art. VIII, § 1 (emphasis supplied).

of agricultural land and horticultural land as "a separate and distinct class of property" and imposes a uniformity requirement upon "all property within the class of agricultural land and horticultural land."

This court, TERC, and the county boards of equalization are all bound by the Nebraska Constitution. As this court has said:

> "A written Constitution is not only the direct and basic expression of the sovereign will, but is the absolute rule of action and decision for all departments and offices of government with respect to all matters covered by it and must control as it is written until it shall be changed by the authority that established it. . . ."[2]

As I explain below, article VIII, § 1(4), commands that all agricultural land and horticultural land be equalized with all other agricultural and horticultural lands, regardless of subclasses. Neither this court nor the tribunals below may ignore this constitutional mandate.

The uniformity clause has ancient roots. It originated in the constitution of 1875.[3] The modern language began with the constitutional revisions of 1920, which, as relevant here, required simply that "taxes shall be levied by valuation uniformly and proportionately upon all tangible property."[4]

The rules as to uniformity and equal protection of the laws apply not only to acts of the legislative department but also to the valuation by the assessing officers.[5] Discrimination in valuation, where it exists, does not necessarily result from the terms of the tax statute, but may be caused by the acts of the taxing officer or officers.[6]

---

[2] *State ex rel. Caldwell v. Peterson*, 153 Neb. 402, 408, 45 N.W.2d 122, 127 (1950) (quoting 11 Am. Jur. *Constitutional Law* § 44).

[3] See Neb. Const. art. IX, § 1 (1875).

[4] Neb. Const. art. VIII, § 1 (1920).

[5] *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000).

[6] *Id*.

This court has long said that the paramount object of the constitution and the laws relative to taxation is to raise all needful revenues by valuation of the taxable property so that each owner of property taxed will contribute his, her, or its just proportion of the public revenues.[7] The object of the law of uniformity is accomplished if all property within the taxing jurisdiction is assessed at a uniform standard of value, as compared with its actual market value.[8] "Thus if the property of one citizen is valued for taxation at onefourth its value, others within the taxing district have the right to demand that their property be assessed on the same basis."[9] In other words, this court said, the constitution forbids any discrimination whatever among taxpayers.[10] Numerous cases have applied the uniformity clause in this way.[11]

As to most real estate, Nebraska law still mandates equalization with all other real estate subject to taxation. Above, I quoted article VIII, § 1(1), which commands that "[t]axes shall be levied by valuation uniformly and proportionately upon all real property . . . as defined by the Legislature except as otherwise provided in or permitted by this Constitution." Likewise,

---

[7] See *State v. Savage*, 65 Neb. 714, 91 N.W. 716 (1902).

[8] See *id.*

[9] *Id.* at 744, 91 N.W. at 720.

[10] *Id.*

[11] See, e.g., *County of Douglas v. Nebraska Tax Equal. & Rev. Comm.*, 262 Neb. 578, 635 N.W.2d 413 (2001); *AT&T Information Sys. v. State Bd. of Equal.*, 237 Neb. 591, 467 N.W.2d 55 (1991); *Konicek v. Board of Equalization*, 212 Neb. 648, 324 N.W.2d 815 (1982); *County of Buffalo v. State Board of Equalization & Assessment*, 158 Neb. 353, 63 N.W.2d 468 (1954); *Laflin v. State Board of Equalization and Assessment*, 156 Neb. 427, 56 N.W.2d 469 (1953); *Homan v. Board of Equalization*, 141 Neb. 400, 3 N.W.2d 650 (1942); *Continental Ins. Co. v. Smrha*, 131 Neb. 791, 270 N.W. 122 (1936); *Chicago, R. I. & P. R. Co. v. State*, 111 Neb. 362, 197 N.W. 114 (1923); *State v. Fleming*, 70 Neb. 523, 97 N.W. 1063 (1903); *State v. Savage, supra* note 7; *State v. Osborn*, 60 Neb. 415, 83 N.W. 357 (1900); *High School District v. Lancaster County*, 60 Neb. 147, 82 N.W. 380 (1900); *State, ex rel. Ahern, v. Walsh*, 31 Neb. 469, 48 N.W. 263 (1891); *Clother v. Maher*, 15 Neb. 1, 16 N.W. 902 (1883).

a Nebraska statute requires that "[t]he county board of equalization shall fairly and impartially equalize the values of all items of real property in the county so that all real property is assessed uniformly and proportionately."[12] The purpose of equalization of assessments is to bring the assessment of different parts of a taxing district to the same relative standard, so that no one of the parts may be compelled to pay a disproportionate part of the tax.[13]

But through amendments begun in 1984,[14] revised in 1989,[15] and completed in 1992,[16] the constitution was amended to allow agricultural and horticultural lands to be valued disproportionately from other types of real property but to require them to be valued uniformly and proportionately with other agricultural and horticultural lands.[17] For the reader's convenience, I repeat that portion of the constitution, which now reads,

> the Legislature may provide that agricultural land and horticultural land, as defined by the Legislature, shall constitute a separate and distinct class of property for purposes of taxation and may provide for a different method of taxing agricultural land and horticultural land which results in values that are not uniform and proportionate with all other real property and franchises *but which results in values that are uniform and proportionate upon all property within the class of agricultural land and horticultural land*.[18]

The principles of interpreting a constitutional provision are well settled. The words in a constitutional provision must be interpreted and understood in their most natural and obvious

---

[12] Neb. Rev. Stat. § 77-1501 (Reissue 2018).

[13] *Krings v. Garfield Cty. Bd. of Equal.*, 286 Neb. 352, 835 N.W.2d 750 (2013).

[14] See 1984 Neb. Laws, L.R. 7, § 1.

[15] See 1989 Neb. Laws, L.R. 2, § 1.

[16] See 1992 Neb. Laws, L.R. 219CA, § 1.

[17] See Neb. Const. art. VIII, § 1(4).

[18] Neb. Const. art. VIII, § 1(4) (emphasis supplied).

meaning unless the subject indicates or the text suggests that they are used in a technical sense.[19] If the meaning of a constitutional provision is clear, the court will give to it the meaning that obviously would be accepted and understood by laypersons.[20] Constitutional provisions are not subject to strict construction and receive a broader and more liberal construction than do statutes.[21] It is the duty of courts to ascertain and to carry into effect the intent and purpose of the framers of the constitution or of an amendment thereto.[22]

Here, the plain language requires uniformity within the entire class of agricultural land and horticultural land. This court is not permitted to read into this clause words which are not there or to omit words. I respectfully submit that the majority does so, at least implicitly. But the plain constitutional language commands that "all property within the class of agricultural land and horticultural land" be equalized.

First, the beginning part of § 1(4) states the singular "*a separate and distinct class*" and not a plural "*one or more separate and distinct classes*." (Emphasis supplied.) Second, the words "all property" immediately precede the words "within the class."[23] Third, the last phrase reads, "uniform and proportionate upon all property within *the class* of agricultural land and horticultural land" a construction using singular and not plural.[24] This provides a plain command to equalize all property within the class of agricultural land and horticultural land, and it simply does not permit equalization only within an agricultural subclass. My reading is, I respectfully suggest, the way these words and phrases would be read by a layperson.

---

[19] *State ex rel. Peterson v. Shively*, 310 Neb. 1, 963 N.W.2d 508 (2021).

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] Neb. Const. art. VIII, § 1(4).

[24] *Id*. (emphasis supplied).

The Legislature reads § 1(4) the same way that I do. A statute proclaims, "The Legislature finds and declares that agricultural land and horticultural land shall be a separate and distinct class of real property for purposes of assessment."[25] It then states, "The assessed value of agricultural land and horticultural land shall not be uniform and proportionate with all other real property, but the assessed value shall be uniform and proportionate within the class of agricultural land and horticultural land."[26] Thus, the legislative language, consistent with that of the constitution, mandates that assessed value shall be uniform and proportionate within *the class* of agricultural land and horticultural land.

Our previous case law construed this constitutional language the same way. We said that after the amendments to article VIII, § 1, and the enactment of statutes pursuant to such authority providing for a different method of taxing agricultural and horticultural land, the constitution does not require uniformity between the class of agricultural and horticultural land and other types of real estate.[27] From this development, we drew two principles: (1) "[I]t is no longer required or proper to equalize the value of nonagricultural, nonhorticultural land with the value of agricultural and horticultural land," and (2) "[e]qualization is still required within the class of agricultural and horticultural land, because the constitution still requires uniformity within that class."[28]

For the sake of completeness, I note that during floor debate of the 1984 legislation submitting an amendment of article VIII, § 1, to the voters, senators read the phrase the same way. Admittedly, that language was slightly different, in that it added a sentence stating, "The Legislature may provide that agricultural land and horticultural land used solely for agricultural or horticultural purposes shall constitute a separate and

---

[25] Neb. Rev. Stat. § 77-1359 (Reissue 2018).

[26] *Id*.

[27] *Krings v. Garfield Cty. Bd. of Equal., supra* note 13.

[28] *Id*. at 361, 835 N.W.2d at 756.

distinct class of property for purposes of taxation."[29] One senator stated:

> If you read the language very carefully, it says, I'll just read the last part, "shall constitute a separate and distinct class." Very singular. It says there will be one class, a class. What it says is, "agricultural land and horticultural land taken together as a group will constitute a single class." I think we could probably diagram that on the blackboard and all but I believe it is very clear that it is singular and it is just a class. We're not creating two classes.[30]

Another senator agreed "100 percent."[31] Although the 1984 language differed slightly, it closely resembles the current constitutional wording.

While another statute further divides agricultural land and horticultural land into classes and subclasses, nothing in that other statute suggests that a misclassification protects an assessment from the requirements of uniformity and proportionality.[32]

Here, TERC was reviewing the refusal of the county board of equalization to equalize comparable agricultural properties within the same taxing district in Lancaster County. The majority suggests that the county board had no plain duty to correct an individual discrepancy. But our case law teaches otherwise.

In *Bartlett v. Dawes Cty. Bd. of Equal.*,[33] this court reiterated three important principles. First, a county board of equalization has the duty to correct and equalize individual discrepancies and inequalities in assessments within the county.[34] Second, in

---

[29] 1984 Neb. Laws, L.R. 7, § 1.

[30] Floor Debate, L.R. 7, 88th Leg., 1st Spec. Sess. 340 (Aug. 29, 1984) (remarks of Senator Ron Withem).

[31] *Id.* (remarks of Senator Peter Hoagland).

[32] See Neb. Rev. Stat. § 77-1363 (Cum. Supp. 2020).

[33] *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000) (superseded by statute on other grounds as stated in *Cain v. Custer Cty. Bd. of Equal.*, 298 Neb. 834, 906 N.W.2d 285 (2018)).

[34] See *id.*

carrying out this function, the county board must give effect to the constitutional requirement that taxes be levied uniformly and proportionately upon all taxable property in the county.[35] Finally, this basic duty of county boards of equalization remains unchanged by enactment of the Tax Equalization and Review Commission Act.[36]

The correct remedy for equalization was recognized by the U.S. Supreme Court nearly 100 years ago in *Sioux City Bridge v. Dakota County*,[37] which reversed a decision of this court.[38] There, this court found that a property, which had a valuation disproportionately higher than comparable property, should not have its valuation lowered.[39] This court ruled that when a property is assessed at its true value, and other property in the district is assessed below its true value, the proper remedy is to have the property assessed below its true value raised, rather than to have property assessed at its true value reduced.[40]

The U.S. Supreme Court reversed this court's decision and remanded the case for further proceedings.[41] The high court stated that "such a result as that reached by [this court] is to deny the injured taxpayer any remedy at all because it is utterly impossible for him by any judicial proceeding to secure an increase in the assessment of the great mass of underassessed property in the taxing district."[42] The Court further stated, "The conclusion is based on the principle that where it is impossible to secure both the standard of the true value,

---

[35] See *id*.

[36] See *id*.

[37] *Sioux City Bridge v. Dakota County*, 260 U.S. 441, 43 S. Ct. 190, 67 L. Ed. 340 (1923).

[38] See *Sioux City Bridge Co. v. Dakota County*, 105 Neb. 843, 182 N.W. 485 (1921).

[39] See *id.*

[40] See *id.*

[41] See *Sioux City Bridge v. Dakota County, supra* note 37.

[42] *Id.*, 260 U.S. at 446.

and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law."[43]

Because the high court applied federal constitutional law, the majority attempts to discredit the remedy. But the basic principle of that case is instructive. Where it is impossible to increase the misclassified agricultural land to its true value, the preferred remedy is to reduce the injured taxpayer's property value to achieve the uniformity required. To refuse to do so deprives the taxpayer of a remedy.

This court's more recent uniformity clause jurisprudence has also provoked criticism.[44] The majority's implicit application of the uniformity clause only within a subclass is fraught with the danger of unintended consequences. Surely, this recent experience counsels that in interpreting the uniformity clause, this court should strictly adhere to the constitutional text, the enabling legislation, and our previous case law—all of which require application of the uniformity clause to all property within the class of agricultural land and horticultural land. After all, "Those who cannot remember the past are condemned to repeat it."[45]

Properly understood, § 1(4) accomplishes two related goals. First, it permits agricultural and horticultural lands *not* to be valued uniformly and proportionately with other types of real estate, such as residential, commercial, or industrial lands. Second, it imposes a uniformity requirement for all lands *within* the *separate class* of agricultural land and horticultural land.

Here, the assessments were not equalized. Mary's Farm was comparable to the Morrison property: they were located in close proximity to one another and both were used as irrigated

---

[43] *Id.*

[44] See George Kilpatrick, *Personal Property Tax Post Mortem: What Lies Ahead for Nebraska*, 27 Creighton L. Rev. 25 (1993).

[45] George Santayana, The Life of Reason: Reason in Common Sense 284 (Scribner's 1905).

cropland. Though comparable, the Morrison property was misclassified as dry cropland. This led to its having a lower tax valuation. Because the irrigated acres on the Morrison property were assessed at a lower rate than the irrigated acres on Mary's Farm, the Mosers' property was not "equalized" with the value of other agricultural land in Lancaster County. As a result, the Mosers paid a disproportionate part of the tax.

If a taxpayer's property is assessed at a value in excess of its actual value, or in excess of that value at which others are taxed, then the taxpayer has a right to relief.[46] The right is to have the taxpayer's property assessment reduced to the percentage of the property's value at which others are taxed.[47] TERC's decision enforced that right.

The majority incorrectly contends that application of our longestablished uniformity clause jurisprudence would have "farreaching consequences." It quotes the county board's brief regarding equalization that might be required due to a protest based on a "finished basement" or a "residence that is built and unreported."[48]

But these examples would not result in reduction of the values of all other properties. Only a taxpayer who protested and persisted in that protest would receive equalization and only if that taxpayer's property were significantly overvalued in comparison to the undervalued property. In other words, the situation here did not require the county board to lower *all* irrigated farmland valuations to the Morrison property's level. But it did require the county board to equalize the Mosers' property with the Morrison property.

This is a natural consequence of equalization at the local level, in order to provide a remedy for a protesting taxpayer disadvantaged by another taxpayer's undervaluation. Here,

[46] See, *AT&T Information Sys. v. State Bd. of Equal., supra* note 11; *Zabawa v. Douglas Cty. Bd. of Equal.*, 17 Neb. App. 221, 757 N.W.2d 522 (2008).

[47] See, *Chief Indus. v. Hamilton Cty. Bd. of Equal.*, 228 Neb. 275, 422 N.W.2d 324 (1988); *Konicek v. Board of Equalization, supra* note 11.

[48] See brief for appellant at 11.

equalization would reduce the protesting taxpayers' burden in a way not required for other similarly situated taxpayers who failed to file protests or to appeal from the denial of their protests. This matters not. Other taxpayers' failure to exercise their rights is no defense to granting such relief to a taxpayer who did so exercise such taxpayer's rights.[49]

The majority purports to avoid this clear constitutional command, but it cannot hide from the reality. The majority suggests the Mosers should have protested the Morrison property's valuation. Nothing in the statute cited by the majority[50] or in that statute's 2018 amendment[51] suggests an intention to displace the traditional equalization remedy. Nothing in the county board's brief makes any such argument. Nor has any decision of this court or the Nebraska Court of Appeals so held. And this notion flies in the face of longsettled uniformity clause jurisprudence. I have already cited our numerous cases requiring equalization. And this court has repeatedly said that if the property of one citizen is valued for taxation at onefourth its value, others within the taxing district have the right to demand that their property be assessed on the same basis.[52] Here, the owners of the Morrison property are the "one citizen" and the Mosers are the "others within the taxing district." The Mosers had the right to demand assessment on the same basis.

In this situation, the county board had the plain duty to equalize. TERC was perhaps charitable in relying only on plain duty and not systemic discrimination. The county board's

---

[49] 84 C.J.S. *Taxation* § 42 (2022) (citing *Kuiters v. County of Freeborn*, 430 N.W.2d 461 (Minn. 1988)).

[50] See Neb. Rev. Stat. § 77-1502 (Cum. Supp. 2022).

[51] See 2018 Neb. Laws, L.B. 885, § 1 (adding requirement that protest "indicate whether the person signing the protest is an owner of the property or a person authorized to protest on behalf of the owner").

[52] See, *Gamboni v. County of Otoe*, 159 Neb. 417, 67 N.W.2d 489 (1954), *overruled in part on other grounds, Hansen v. County of Lincoln*, 188 Neb. 461, 197 N.W.2d 651 (1972); *State v. Back*, 72 Neb. 402, 100 N.W. 952 (1904); *State v. Savage, supra* note 7; *State v. Karr*, 64 Neb. 514, 90 N.W. 298 (1902); *State v. Osborn, supra* note 11.

failure to correct the misclassification after hearing the taxpayers' protest for the first year suggests, at best, bureaucratic ineptitude, or, worse, a disdain for taxpayers' rights in the equalization process. Our traditional equalization jurisprudence places the incentive for diligence where it belongsupon the taxing authority.

The majority purports to limit its refusal to equalize to "error in the subclassification and undervaluation of one taxpayer's property." But there is no principled distinction, based in law, between errors in misclassification involving multiple tracts. Perhaps at some point, such errors might be described as systemic. But the majority does not announce a principle which can guide county boards of equalization and TERC in distinguishing when misclassifications are merely "isolated error." And I respectfully urge that the uniformity clause does not condone this notion. Our case law teaches otherwise.

TERC was required to faithfully apply Neb. Const. art. VIII, § 1(4), and it did so. TERC's decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. I would affirm its decision. Because the majority takes a different course, I respectfully dissent.

Papik and Freudenberg, JJ., join in this dissent.